**J. P., et al., Plaintiffs,**

**M. R., et al., Plaintiffs-Appellants, Cross-Appellees,**

**v.**

**Andrew J. DeSANTI, et al., Defendants-Appellees, Cross-Appellants.**

**Nos. 79–3478, 79–3479.**

United States Court of Appeals, Sixth Circuit.

Decided and Filed July 15, 1981.

Rehearing and Rehearing En Banc Denied September 10, 1981.

Kenneth D. Petrey, Margaret L. Terry, Cleveland, Ohio, for plaintiffs-appellants, cross-appellees.

John T. Corrigan, Prosecuting Atty., Thomas P. Gill, Cleveland, Ohio, for defendants-appellees, cross-appellants.

Before MERRITT, BROWN and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

This case requires us to decide whether under the principles first articulated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the District Court was obliged to abstain from deciding a class action challenge to certain aspects of state juvenile court procedures, and further, whether there exists a constitutional right of privacy which is violated by disclosure of juvenile court records. The District Court ruled that abstention was inappropriate. It reached the merits of all of the issues raised by appellant class, in the process finding a constitutional right to nondisclosure. We reverse.

This action was brought by appellants, the class of juveniles who have appeared in the past or may appear in the future before the Juvenile Court of Cuyahoga County, Ohio, on complaints of delinquency, unruliness, neglect, dependency and abuse. Appellees/cross-appellants (appellees) are those employees of the juvenile court responsible for compiling social histories of juveniles, submitting them to the judges, and maintaining custody of the social histories after disposition of a juvenile's case.

When a young person is brought before the Juvenile Court of Cuyahoga County,

Ohio, it is the practice of the court's probation officers to compile a social history of the juvenile. Social histories contain information from a number of sources, including the complaining parties, the juveniles themselves, their parents, school records, and their past records in the juvenile court. They also include any information on record pertaining to other members of the family, and any other information that the probation officer thinks is relevant to the disposition of a case before the juvenile court. Receipt of written consent from juveniles or their families is not a prerequisite to compilation of social histories, and although access to social histories is available to juveniles' lawyers, access is not available to juveniles or their families.

Ohio R.Juv.P. 32 authorizes submission of a social history to the juvenile court judge for certain limited purposes prior to adjudication of a juvenile's case on the merits. The District Court found that the practice in Cuyahoga County is to make the social history available to the court before the adjudicatory hearing as a matter of course, although the juvenile court judges did not consult the social history prior to adjudication or an admission by the juvenile. The District Court also found that juvenile court referees frequently discuss a juvenile's case ex parte with probation officers before an adjudicatory hearing. At the conclusion of a case the social history is kept on file at the juvenile court, where, upon request, it is available to 55 different government, social and religious agencies that belong to a "social services clearinghouse."

Appellants brought this action under 42 U.S.C. § 1983 to enjoin the juvenile court's use of social histories as unconstitutional. Appellants further asserted that insofar as Ohio R.Juv.P. 32 authorizes the pre-adjudication use of social histories, it, too, is unconstitutional. In addition, two named members of appellant class demanded $25,000 damages for violation of their constitutional right to privacy.

Appellees moved the District Court to abstain on the basis of *Younger v. Harris*. The District Court denied the motion and proceeded to enjoin all ex parte communications between juvenile court judges and probation officers before a juvenile's adjudicatory hearing. It made receipt of written consent from juveniles or their parents a prerequisite to compilation of the social history, but did not require that juveniles receive an exhaustive list of the consequences of consenting. It ruled that juveniles and their families must be afforded pre-adjudication access to the social histories. The District Court held that Rule 32 is constitutional insofar as it provides for limited pre-adjudication use of social histories, but it enjoined the Cuyahoga County Juvenile Court from any pre-adjudication use not specified in Rule 32. The District Judge denied the claim for damages, but found that the post-adjudication dissemination of social histories violated appellants' constitutional right to privacy. He limited post-adjudication dissemination of social histories to employees of the juvenile court, and established detailed procedures under which those employees could obtain access.

## I ABSTENTION

In *Younger v. Harris* the Supreme Court held that absent extraordinary circumstances a federal court should not enjoin a pending state criminal proceeding. Subsequent decisions have made clear that the policy of equitable restraint expressed in *Younger* was not based on factors unique to a criminal trial:

> [*Younger*] reflects a strong policy against federal intervention in state judicial processes in the absence of great and irreparable injury to the federal plaintiff . . . . The basic concern—that threat to our federal system posed by displacement of state courts by those of the National Government—is also fully applicable to civil proceedings in which important state interests are involved.

*Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979). *See also, Trainor v. Hernandez*, 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977).

Appellants' suit challenges the methods by which an Ohio juvenile court administers

complaints involving Ohio youth. This is a matter in which the State of Ohio unquestionably has important interests. Thus, *Younger* principles of abstention are called into play if there existed a pending or ongoing juvenile proceeding.

■ The District Court's first ground for denying appellees' motion to abstain was that "[t]he principles of *Younger* are inapplicable to the instant action, inasmuch as the Juvenile Court proceeding against [a named class member] has been resolved." In reaching this conclusion the District Judge did not have the benefit of our decision in *Parker v. Turner*, 626 F.2d 1 (6th Cir. 1980). In that case a class of plaintiffs consisting of indigent fathers who were under a state court order to pay child support sought to guarantee that the juvenile court would observe due process of law when citing them for contempt for nonpayment. We held that *Younger* barred the federal suit, although there was no showing that any member of the class was currently the subject of a state contempt proceeding. Judge Merritt, concurring, noted that the "pending state proceeding" hurdle had been cleared because the relief sought on behalf of the class would affect all pending state contempt proceedings for nonpayment. 626 F.2d at 10.

The same reasoning applies with even more force here. Appellant class consists of

> those juveniles appearing before the juvenile court on complaints of delinquency, unruliness, neglect, dependency, and abuse who are adversely affected by the preparation and use of "social histories" prior to an adjudicatory hearing of the outstanding charges and retention and

dissemination of those "social histories" or information therefrom subsequent to the final disposition of the pending charges.

In its order certifying the class the District Court relied on the fact that the proposed class consisted of approximately 11,000 juveniles per year who appear before the juvenile court and are subject to the complained of practices. It is a certainty that there are always juvenile court proceedings pending with respect to some class members. Thus, *Younger* required the District Court to abstain unless some exception to the doctrine applied.

The District Court's alternative ground for declining to abstain was that the use of social histories by juvenile court referees and judges "is merely collateral to the adjudicatory proceedings conducted by the Juvenile Court, and the declaratory and injunctive relief demanded by the plaintiff will therefore not *substantially* interfere with the administration of the Juvenile Court." (Emphasis added) Hence, the court concluded, the rationale for abstention did not apply. In so holding, the District Judge relied on *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and *Conover v. Montemuro*, 477 F.2d 1073 (3d Cir. 1973).[1]

■ The Supreme Court held in *Gerstein v. Pugh* that *Younger* did not bar a federal suit by a state defendant in pretrial custody who sought a probable cause hearing before he could be further detained. The Court reasoned that since the federal issue could not be raised as a defense to the criminal prosecution, and federal resolution of the pretrial detention issue "could not prejudice

---

1. At issue in *Conover* was a federal challenge to Philadelphia Juvenile Court intake procedures, procedures that determined which juveniles would be brought before the court. The Third Circuit reviewed its rules for abstention, among which it included the following:

> G. Even if a state prosecution is pending, injunctive or declaratory relief against state officers with respect to violations of federal constitutional rights not amounting to an injunction which will *halt* or *substantially interfere* with a pending prosecution may still be available.

477 F.2d at 1080 (emphasis added). The court held:

> Since a remedy with respect to the intake procedures would not necessarily interfere with the adjudication functions of the Commonwealth's juvenile court, it is therefore not necessarily precluded by *Younger v. Harris*, *supra*, or *Samuels v. Mackell*, [401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688] *supra*.

*Id.* at 1082.

the conduct of the trial on the merits," the federal court could grant relief. 420 U.S. at 108 n.9, 95 S.Ct. at 860 n.9. The Supreme Court reviewed *Gerstein* as follows in *Moore v. Sims, supra*: "[*Gerstein*] held that the District Court properly found that the action was not barred by *Younger* because the injunction was not addressed to a state proceeding and therefore would not interfere with the criminal prosecutions themselves." 442 U.S. at 431, 99 S.Ct. at 2381. Because the relief granted in *Gerstein* caused *some* interference with Florida's handling of its criminal prosecution, the Court's statements in *Gerstein* and *Moore* can be read to imply that abstention is not called for where the interference with state proceedings is of a magnitude less than or equal to that at issue in *Gerstein*. However, as the Court in *Moore* went on to say: "This Court has addressed the *Younger* doctrine on a number of occasions since *Gerstein*." 442 U.S. at 431–432, 99 S.Ct. at 2381–2382. In light of those subsequent cases we do not think the Supreme Court intends that *Younger* abstention will be triggered only by "substantial" interference with a proceeding involving important state interests. Indeed, we think the Court's cases require abstention if federal intervention would cause even minimal interference with such a state proceeding and the federal issue can be raised in the state proceeding.

In *Trainor v. Hernandez, supra*, the federal plaintiffs were charged in a state action with fraud against the state. In conjunction with the fraud action the state attached the federal plaintiffs' property. The federal plaintiffs sought only to enjoin the attachment in the federal suit, arguing on the strength of *Gerstein* that *Younger* did not bar the injunction because granting it would not interfere with the underlying fraud action. The Supreme Court found that the attachment was sufficiently related to the fraud action to require abstention. 431 U.S. at 446 n.9, 97 S.Ct. at 1919 n.9.

We do not perceive any significant distinction between the level of interference that triggered abstention in *Trainor v. Hernandez* and that at issue in *Gerstein*. Rath-

er, it is the federal plaintiffs' opportunity to raise their claim in the state proceedings that distinguishes the cases. The Supreme Court explicitly found that no such opportunity existed in *Gerstein*, 420 U.S. at 106, 95 S.Ct. at 859, and remanded for consideration of this issue in *Trainor*. 431 U.S. at 447, 97 S.Ct. at 1919. Once again we find support in *Moore v. Sims*: "In *Juidice v. Vail*, 430 U.S., [327] at 336–337, [97 S.Ct. 1211 at 1217–1218, 51 L.Ed.2d 376], we noted that the teaching of *Gerstein* was that the federal plaintiff must have an opportunity to press his claim in the state courts . . . ." 442 U.S. at 432, 99 S.Ct. at 2381.

■ Thus, the collateral issue exception to abstention relied on by the District Court is overbroad. Federal courts may hear those issues that can be raised in a state proceeding only if their resolution will not cause even minimal interference with a pending state proceeding that implicates important state interests. The federal suit by appellant class clearly interfered with Cuyahoga County juvenile proceedings. The challenged practice—the juvenile court's predisposition use of social histories—is an integral part of the juvenile court's handling of cases. The relief granted entails ongoing federal court interference with the daily operation of the juvenile court. Alleged violations of the injunction against ex parte communication concerning a juvenile's case, or questions about whether a juvenile was fully informed as to the consequences of consenting to compilation of the social history, would have to be heard in the first instance in the federal district court.

■ Appellant class argues that Ohio law afforded it no opportunity to challenge the use of social histories in the juvenile court. Appellants have not established this claim, *cf. Moore v. Sims*, 442 U.S. at 432, 99 S.Ct. at 2381, and our review of Ohio law indicates the contrary. Ohio Rev.Code § 2151.23, the statutory grant of jurisdiction to the juvenile courts, does not limit the juvenile court to deciding only particular aspects of a juvenile's case, or in any

way restrict its jurisdiction, other than by limiting the court to dealing with juveniles. Section 2151.01 states that juvenile court jurisdiction is to be "construed liberally to assure the parties a fair hearing in which their constitutional and other legal rights are recognized and enforced." Ohio R.Juv.P. 22(A) provides that a party may move to dismiss the complaint in a juvenile action "or for other appropriate relief," which on its face certainly affords appellant class an opportunity to enjoin the juvenile court's use of social histories before and during the adjudication. If it does not, Ohio R.Juv.P. 45 states that "[i]f no procedure is specifically prescribed by [the Rules of Juvenile Procedure] the court shall proceed in any lawful manner not inconsistent therewith."

Appellant class also argues that to require it to challenge the use of social histories in the first instance in the state court will subject it to irreparable harm, in that there is an invasion of privacy as soon as a social history is compiled, and by the time the adjudicatory hearing is held it is far too late to correct this violation of a constitutional right. Appellants misperceive the nature of the irreparable harm that justifies ignoring the principles of the *Younger* abstention doctrine. As the Supreme Court stated in *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 603, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975),

> [t]he seriousness of federal judicial interference with state civil functions has long been recognized by this Court. We have consistently required that when federal courts are confronted with requests for such relief, they should abide by standards of restraint that go well beyond those of private equity jurisprudence.

*Younger* counsels abstention unless the threatened injury is "great, immediate, and irreparable"; unless " 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issue before it . . . ." *Moore v. Sims*, 442 U.S. at 433, 99 S.Ct. at 2382 (citation omitted). The minimal invasion of appellants' privacy that occurs through compiling a social history is not of such a magnitude

to justify our otherwise inappropriate intervention in state affairs. In fact, plaintiffs in *Moore v. Sims* raised a very similar concern in their claim that they would be irreparably harmed by an anonymous report that they were child abusers under Texas law, since that report would be filed in a national registry. *Sims v. State Dep't of Public Welfare*, 438 F.Supp. 1179 at 1187. The Supreme Court did not find sufficiently great and irreparable injury to justify federal court intervention.

The District Court should therefore have abstained from deciding those claims that pertained to the compilation and use of social histories prior to or during the adjudicatory hearing.

## II  POST–ADJUDICATION DISSEMINATION OF SOCIAL HISTORIES

■ Unlike appellants' challenges to the juvenile court's use of social histories before and during an adjudication, their challenge to post-adjudication use of the social histories could not be raised in any pending state judicial proceedings. Moreover, adjudication of this claim does not interfere in any manner with ongoing juvenile court proceedings. This aspect of appellants' claim is logically and legally unrelated to their other claims for relief. Thus it falls into that class of claims so collateral that abstention is not appropriate.

Appellant class alleged that the post-adjudication dissemination of juveniles' social histories to 55 governmental, social, and religious agencies that were members of a "social services clearing-house" violated their constitutional right of privacy. The class sought to enjoin access to social histories by anyone except juvenile court personnel. Two named members of the class sought damages of $25,000.

The District Judge held that dissemination beyond juvenile court employees was a violation of Ohio Rev.Code § 2151.14, which provides that "the reports and records of the probation department shall be considered confidential information and shall not be made public." He also found, appar-

ently on a constitutional basis, that the disclosure "violates the right of juveniles and their family members 'to have intimate biographical details protected from exposure by the government.'" He enjoined the continued dissemination of social histories to any but juvenile court employees and established specific procedures under which those employees could obtain access, but denied appellants' claim for damages. Appellees appeal the conclusion that their practices violate either state law or the Federal Constitution.

■ Our initial inquiry is whether the District Court properly exercised jurisdiction over the state law issue. The question of state law was properly before the District Court, if at all, only pendent to the federal claim. The federal courts have the *power* to hear state law claims if one would ordinarily be expected to raise them with one's federal claims in a single judicial proceeding, and if the federal claim is of sufficient substance to confer subject matter jurisdiction on the court. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). In this case, the conduct that is alleged to violate the Federal Constitution is the same conduct which the District Court found to violate Ohio law. If appellants were interested in raising the state law issue, they would have done so in this federal proceeding. Appellants' claim that their constitutional right to privacy has been violated is at least colorable. Thus, under *Gibbs* the District Court had the power to decide whether the post-adjudication dissemination violated Ohio Rev.Code § 2151.14.

However, the Supreme Court in *Gibbs* went on to draw a distinction between the power to decide a state law claim under the doctrine of pendent jurisdiction and the exercise of that power:

That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.

*Id.* at 726, 86 S.Ct. at 1139 (footnotes omitted). The state law issue involved here, raising as it does questions of state intrusion into individual privacy, is a matter in which Ohio has substantial interest. Thus, considerations of comity loom large.

■ Appellants did not raise the question whether post-adjudication dissemination of social histories violated Ohio law. Neither did appellees. There is no mention of Ohio Rev.Code § 2151.14 in the entire record on appeal other than in the opinion of the District Court. From the record it appears that the District Court struck out on its own in search of state law relevant to appellants' suit. The case for exercising pendent jurisdiction is substantially weakened when it is the District Court that raises the state law question.

The exercise of pendent jurisdiction is further questionable where the record is not sufficient to permit a well-considered decision. A proper interpretation of section 2151.14 rests on whether releasing juvenile court records to members of a social services clearinghouse is the same as making them "public," or is a breach of "confidentiality." Resolution of these questions depends on the nature of the organizations that have access to the juvenile court records through the social services clearinghouse, and the use they make of such records. However, because neither appellant class nor appellees addressed this issue, the record on appeal is silent as to the purpose of disclosing juvenile court records to those agencies or even the nature of the agencies, beyond what is apparent from their names.

Nor is Ohio law at all clear on the proper resolution of this important question of

state law. The cases that the District Court cites do not support, or even relate to, its conclusion that the post-adjudication dissemination in this case violated section 2151.14. *State v. Hale*, 21 Ohio App.2d 207, 256 N.E.2d 239 (1969), held only that there was no violation of section 2151.14 where a probation officer testified as to the existence of juvenile court records in a criminal proceeding against a former juvenile, but did not testify as to the content of any records. *State v. Sherow*, 101 Ohio App. 169, 138 N.E.2d 444 (1956), held that section 2151.14 did not give a juvenile court judge the power to enjoin publication of the names of juvenile delinquents.

There are situations where it is nonetheless desirable to decide a question of state law to avoid deciding unnecessarily a hard question of federal constitutional law. However, this policy does not support the exercise of pendent jurisdiction here. The two named appellants sought damages for the invasion of their constitutional right of privacy by dissemination of juvenile court records. As a result, the District Court was required to decide the constitutional claim, the resolution of which does not depend on state law.

For the above reasons we hold that the District Judge abused his discretion by exercising jurisdiction to interpret section 2151.14.

The District Court made no attempt to tie the constitutional right "to have intimate biographical details protected from exposure by the government" to any particular provision of the Constitution. The Constitution does not explicitly mention a right of privacy.[2] Nor has the Supreme Court recognized the existence of a general right to privacy.

At various times the Court has found a concern for privacy underlying some of the provisions of the Bill of Rights. *See, e. g., Stanley v. Georgia*, 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) (the

first amendment protects the right to read and observe what one pleases in the privacy of one's home); *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1872–1874, 20 L.Ed.2d 889 (1968) (the fourth amendment protects areas in which one has a reasonable expectation of privacy from unreasonable searches and seizures); *Katz v. United States*, 389 U.S. 347, 350 n.5, 88 S.Ct. 507, 510 n.5, 19 L.Ed.2d 576 (1967) (the third amendment's prohibition against the peacetime quartering of soldiers protects an aspect of privacy from governmental intrusion); *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965) (several of the provisions of the Bill of Rights create "zones of privacy," including the fifth amendment, which creates a zone of privacy that an individual cannot be forced to surrender to his detriment). The Supreme Court has also held in a line of cases that the Constitution protects an individual's interest in independence in making certain kinds of important decisions. *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–877, 51 L.Ed.2d 64 (1977). Thus, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and progeny have established a woman's right to choose for herself whether to carry a pregnancy to term, at least until the fetus is viable. As the Court recognized in *Roe, id.* at 152–153, 93 S.Ct. at 726–727, this right to independence has also been found for certain decisions relating to marriage, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); procreation, *Skinner v. Oklahoma*, 316 U.S. 535, 541–542, 62 S.Ct. 1110, 1113–1114, 86 L.Ed. 1655 (1942); contraception, *Eisenstadt v. Baird*, 405 U.S. 438, 453–454, 92 S.Ct. 1029, 1038–1039, 31 L.Ed.2d 349 (1972); family relationships, *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); and child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925).

**2.** In fact, privacy received little attention as a legal category until 1890, when the publication of "Right to Privacy," 4 Harv.L.Rev. 193 (1890) led to the creation of the tort right of privacy.

Posner, *The Uncertain Protection of Privacy by the Supreme Court*, 1979 S.Ct.Rev. 173, 176–177.

However, the fact that the Constitution protects several specific aspects of individual privacy does not mean that it protects all aspects of individual privacy. Nor is there indication in any of the above decisions of a constitutional right to nondisclosure of juvenile court records. Rather, such disclosure is indistinguishable from that permitted in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). There the respondent alleged that circulation to merchants by police of the fact of his arrest for shoplifting (he had not been convicted) violated his constitutional right to privacy. The Court recognized that "zones of privacy may be created by more specific constitutional guarantees . . . ." *Id.* at 712–713, 96 S.Ct. at 1165–1166. However, the Court held, "personal rights found in [the] guarantee of personal privacy must be limited to those which are 'fundamental' or 'implicit in the concept of ordered liberty' . . . . Respondent's claim is far afield from [the privacy] line of decisions." *Id.* at 713, 96 S.Ct. at 1166.

The otherwise dispositive effect of *Paul v. Davis* is somewhat clouded by two subsequent Supreme Court decisions and their construction by the courts of appeal. In *Whalen v. Roe, supra,* the Court was asked to declare unconstitutional as an invasion of privacy New York's requirement that the names and addresses of all persons who obtained certain drugs be recorded in a central computer file. In the course of its discussion the Court stated:

> the cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

429 U.S. at 598–600, 97 S.Ct. at 875–877 (footnotes omitted). The language from *Whalen v. Roe* respecting the right to nondisclosure was repeated in *Nixon v. Administrator of General Services*, 433 U.S. 425, 457, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867 (1977).

Some courts have uncritically picked up that part of *Whalen* pertaining to nondisclosure and have created a rule that the courts must balance a governmental intrusion on this "right" of privacy against the government's interest in the intrusion. Thus, in *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577–580 (3d Cir. 1980), the court relied on *Whalen* to hold that there was a constitutional right of privacy in employee medical records kept by an employer, but that the government's interest in investigating dangers to the safety of the employees was sufficient reason to compel disclosure of the records to permit their examination by the National Institute of Occupational Safety and Health. Similarly, in *Fadjo v. Coon*, 633 F.2d 1172, 1175–1176 (5th Cir. 1981), the court relied largely on the above-cited language from *Whalen* to find that an allegation that a state divulged to private parties material that it uncovered in a criminal investigation stated a cause of action under 42 U.S.C. § 1983, and that on remand the district court would have to balance the intrusion into privacy against the government's need for the disclosure. *See also, Plante v. Gonzalez*, 575 F.2d 1119, 1132, 1134 (5th Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979) (*Whalen v. Roe* identified a strand of privacy called the "right to confidentiality." A balancing standard is appropriate in weighing intrusions on this right).[3]

We do not view the discussion of confidentiality in *Whalen v. Roe* as overruling

---

**3.** At least one other court has found a broad right of privacy, although without relying on *Whalen*. In *Doe v. Webster*, 606 F.2d 1226, 1238 n.49 (D.C.1979), the appellant sought to have expunged the record of his conviction which had been set aside under the Youth Corrections Act. The court stated that the right to privacy asserted in *Utz v. Cullinane*, 520 F.2d 467, 482 n.41 (D.C.Cir.1975), and based on *Roe*

*v. Wade*, should encompass a substantial measure of freedom for the individual to choose the extent to which the government may divulge criminal information about him, at least where no countervailing government interest is asserted. The court in *Doe v. Webster* proceeded, however, to order expungement solely on statutory grounds.

*Paul v. Davis* and creating a constitutional right to have all government action weighed against the resulting breach of confidentiality. The Supreme Court's discussion makes reference to only two opinions—*Griswold v. Connecticut, supra,* in which the Court found that several of the amendments have a privacy penumbra, and *Stanley v. Georgia, supra,* a first amendment case—neither of which support the proposition that there is a general right to non-disclosure. *Whalen v. Roe,* 429 U.S. at 599 n.25, 97 S.Ct. at 876 n.25; *see id.* at 607–609, 97 S.Ct. at 880–881 (Stewart, J., concurring). On the facts before it in *Whalen* the Court held that recording the names of persons who obtained certain drugs did *not* violate any possible constitutional right to have information kept private. The Court explicitly refused to address the existence of such a right: "We . . . need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data—whether intentional or unintentional . . . ." *Id.* at 605–606, 97 S.Ct. at 879–880. To assure that there would be no misunderstanding, Justice Stewart wrote separately to note that the Court's opinion did not support the proposition that broad dissemination of the information collected by New York would violate the Constitution. *Id.* at 608–609, 97 S.Ct. at 881.

*Nixon v. Administrator of General Services, supra,* is the only other case in which the Supreme Court has explicitly mentioned a general right to nondisclosure. The former president challenged on constitutional grounds the Presidential Recordings and Materials Preservation Act, 58 Stat. 1695, note following 44 U.S.C. § 2107, which directed the Administrator of General Serv-ices to take custody of presidential tapes and other materials that accumulated during Mr. Nixon's presidency, to separate the private from the public, and to retain the public. In the course of its opinion rejecting Mr. Nixon's challenge the Court stated that "one element of privacy has been characterized as the individual interest in avoiding disclosure of personal matters." 433 U.S. at 457, 97 S.Ct. at 2797.

Like *Whalen, Nixon* does not overrule *Paul v. Davis* and create a general constitutional right of nondisclosure against which government action must be weighed. The Court's cite to *Whalen* was for the apparent purpose of establishing that Mr. Nixon had an expectation of privacy in his papers that entitled him to fourth amendment protection. The Court did not purport to establish a constitutional right to nondisclosure.[4] Lest there be any doubt about the Court's analysis, Justice Stewart concurred with the understanding he expressed in *Whalen* —that the Court was not establishing a general right to nondisclosure of private information. 433 U.S. at 455 n.18, 97 S.Ct. at 2796 n.18.

Absent a clear indication from the Supreme Court we will not construe isolated statements in *Whalen* and *Nixon* more broadly than their context allows to recognize a general constitutional right to have disclosure of private information measured against the need for disclosure. Analytically we are unable to see how such a constitutional right of privacy can be restricted to anything less than the general "right to be let alone" that Justice Brandeis called for in *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928)

---

4. Though the Court does not explicitly say so, its analysis of the privacy issue in *Nixon* appears to be based on the fourth amendment's requirement that all searches and seizures be reasonable, not on the scope of a general constitutional right to privacy. 433 U.S. at 455–465, 97 S.Ct. at 2796–2801. The district court in *Nixon* concluded that the fourth amendment's warrant requirement was not applicable to the case, since Congress itself had approved the search and had built judicial safeguards into the statute. *Nixon v. Administrator of General Services,* 408 F.Supp. 321, 361 n.56 (D.D.C.1976). The district court proceeded to find that the search was reasonable under the fourth amendment, and hence that Mr. Nixon's rights of privacy were not violated. The Supreme Court agreed that the warrant clause was inapplicable, 433 U.S. at 458 n.21, 97 S.Ct. at 2798 n.21, and also agreed that the search was a reasonable intrusion on Mr. Nixon's legitimate expectations of privacy, in an analysis similar to that used by the district court.

(Brandeis, J., dissenting).[5] "Virtually every governmental action interferes with personal privacy to some degree." *Katz v. United States*, 389 U.S. at 350 n.5, 88 S.Ct. at 510 n.5. Courts called upon to balance virtually every government action against the corresponding intrusion on individual privacy may be able to give all privacy interests only cursory protection. The Framers rejected a provision in the Constitution under which the Supreme Court would have reviewed all legislation for its constitutionality. They cannot have intended that the federal courts become involved in an inquiry nearly as broad—balancing almost every act of government, both state and federal, against its intrusion on a concept so vague, undefinable, and all-encompassing as individual privacy.

Inferring very broad "constitutional" rights where the Constitution itself does not express them is an activity not appropriate to the judiciary. In this context, we note that of the cases cited holding that there is a constitutional right to nondisclosure of private information, none cites a constitutional provision in support of its holding. It is understandable, though rare, to fail to cite a supporting provision of the Constitution when one is dealing with such well-established rights as those in the first or fourth amendments. It is quite a telling failure when the constitutional right at issue is not well-established.

For all of the foregoing reasons we conclude that the Constitution does not encompass a general right to nondisclosure of private information. We agree with those courts that have restricted the right of privacy to its boundaries as established in *Paul v. Davis, supra*, and *Roe v. Wade*, 410 U.S. at 152, 93 S.Ct. at 726—those personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty." *See, e. g., McElrath v. Califano*, 615 F.2d 434, 441 (7th Cir. 1980); *United States v. Choate*, 576 F.2d 165, 181 (9th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978) ("rights under the ninth amendment are only those 'so basic and fundamental and so deeprooted in our society' to be truly 'essential rights,' and which nevertheless, cannot find direct support elsewhere in the Constitution") (citation omitted).[6] The interest asserted by appellant class in nondisclosure of juvenile court records, like the interest in nondisclosure at issue in *Paul v. Davis*, is "far afield" from those privacy rights that are "fundamental" or "implicit in the concept of ordered liberty." The District Court erred in finding that disclosure of juvenile court records to 55 governmental and social agencies violates the Constitution.[7]

Our opinion does not mean that we attach little significance to the right of privacy, or that there is *no* constitutional right to nondisclosure of private information.

5. We are not alone in our inability to limit or define the right of privacy. "The right of privacy is undefined, perhaps, because it is undefinable." Kurland, *The Private I*, The University of Chicago Magazine, Autumn 1976 at 7, 12. When privacy is defined as "the claim of individuals . . . to determine for themselves when, how, and to what extent information about them is communicated to others," every attempt to limit the right is confounded. Gerety, *Redefining Privacy*, 12 Harv.Civ.R.–Civ.L.L. Rev. 233, 261–262 (1977). In fact, "privacy" may not be a meaningful legal concept. Given its "protean capacity to be all things to all people," the concept lacks readily apparent limitations of its own. *Id.* at 234. "Despite over a decade of privacy precedent, the right eludes definition and remains analytically unclear." Eichbaum, *Toward an Autonomy-Based Theory of Constitutional Privacy: Beyond the Ideology of Familial Privacy*, 14 Harv. Civ.R.–Civ.L.L.Rev. 361 (1979).

6. For cases prior to *Whalen v. Roe* to the same effect, *see O'Brien v. DiGrazia*, 544 F.2d 543 (1st Cir. 1976), cert. denied, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977); *McNally v. Pulitzer Publishing Co.*, 532 F.2d 69, 76–78 (8th Cir.), cert. denied, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976).

7. Our decision does not leave the privacy rights of appellant class unprotected. To the contrary, Ohio law provides for the sealing or expungement of juvenile court records two years after a disposition. Ohio Rev.Code § 2151.358. The aforementioned section 2151.14 provides that juvenile court records shall not be made public. We simply hold that the Constitution is not the source of the protection appellants seek.

[A] controlling principle for the governance of society [is] that "there are frontiers not artificially drawn, within which men should be inviolable, these frontiers being defined in terms of rules so long and widely accepted that their observance has entered into the very conception of what is a human being." And it is the idea of the uniqueness of the human quality that makes the concept of privacy so important.

The University of Chicago Magazine, *supra,* at 12. We agree that "the very notion of the national Constitution is that there are aspects of individual behavior that no government, federal or state, could subject to control." *Id.* We recognize the problem that in today's society

> liberty is no longer limited by laws alone, but far more frequently by executive orders, by administrative regulations, by bureaucratic guidelines, by simple exercise of discretion at the lowest level of the governmental pyramid—and even by judicial actions forging major policy determinations for society without constitutional or legislative authority.

*Id.* at 35. Like the Supreme Court,

> [w]e are not unaware of the threat to personal privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files. The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of the criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially harmful or embarrassing if disclosed.

*Whalen v. Roe,* 429 U.S. at 605, 97 S.Ct. at 879.

Our opinion simply holds that not all rights of privacy or interests in nondisclosure of private information are of constitutional dimension, so as to require balancing government action against individual privacy. As with the disclosure in *Paul v. Davis,* protection of appellants' privacy

rights here must be left to the states or the legislative process.

The judgment of the District Court is REVERSED.