[Cite as *State ex rel. Cincinnati Enquirer v. Streicher*, 2011-Ohio-4498.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO EX REL. THE CINCINNATI ENQUIRER, A DIVISION OF GANNETT SATELLITE INFORMATION NETWORK, INC., | : | CASE NO. C-100820 |
| | : | |
| | : | *D E C I S I O N.* |
| Relator, | : | |
| vs. | : | |
| THOMAS STREICHER, | : | |
| Respondent. | : | |
| | : | |

**Original Action in Mandamus**

**Judgment of Court: Writ Denied**

**Date of Judgment Entry on Appeal: September 9, 2011**


*Graydon Head & Ritchey LLP* and *John C. Greiner*, for Relator,

*Peter J. Stackpole*, Assistant City Solicitor, for Respondent.

**FISCHER, Judge.**

{¶1} Relator the Cincinnati Enquirer ("the Enquirer") instituted this original action seeking a writ of mandamus to compel respondent Thomas Streicher, in his capacity as chief of police for the city of Cincinnati,[1] to produce certain records pursuant to R.C. 149.43, the Ohio Public Records Act ("Act"). The records related to a September 2010 incident during which shots were fired between Cincinnati police officers and members of the Iron Horsemen motorcycle club. Because we determine that the information sought by the Enquirer is exempt from disclosure under the Act, we deny the requested writ.

{¶2} The parties have stipulated to the record in this case. Part of that record contains material designated as confidential by Respondent, which remains under seal by order of this court. The nonconfidential portions of the stipulated record revealed the following: The Iron Horsemen motorcycle club has existed in the Cincinnati area for roughly 40 years, but has a nationwide membership. Despite the Iron Horsemen's reputation as "an outlaw motorcycle gang," contact between the Iron Horsemen and the Cincinnati Police Department generally has been limited. Although police had not been conducting an active investigation of the Iron Horsemen, on September 18, 2010, a Cincinnati police officer observed suspicious activity at JD's Honky Tonk bar. Approximately 13 other officers who were nearby assembled and entered the bar. The officers, with one or two exceptions, were undercover officers—they were plainclothes officers assigned to the police

---

[1] Counsel for the city of Cincinnati indicated in the responsive memorandum that Streicher has retired since the filing of this action. Although not mentioned by the parties, in accordance with Civ.R. 25(D)(1), we automatically substitute Streicher's successor as the respondent in this case (hereinafter referred to as "Respondent").

department's "vice squad." Some of the officers were wearing ski masks. A clash between the officers and members of the Iron Horsemen left two city police officers shot, and a member of the Iron Horsemen dead. The incident resulted in only one minor criminal charge—a firearm-related offense against an Iron Horsemen member.

{¶3} Two Enquirer reporters requested information from Respondent regarding the shooting. The reporters specifically requested, among other information, the names of the officers who had been injured along with their personnel records, an incident report, and the name of the Iron Horsemen member who had died. When Respondent did not provide all requested information, the Enquirer made a formal request pursuant to the Act seeking an unredacted copy of the incident report prepared by the police department, unredacted copies of the two officers' personnel files, and an internal affairs report as soon as one became available.

{¶4} Respondent replied to the Enquirer's request by refusing to provide unredacted copies of the incident report and personnel files, citing "significant and ongoing privacy concerns in relation to the physical safety of the Cincinnati police officers * * *." Streicher testified in his deposition that it would not be unusual for a motorcycle club to seek revenge against the police in this situation where one of its members had died, and, therefore, Streicher had been immediately concerned about retaliation after the incident. Deposition of Thomas Streicher at 35-36. Streicher's concern had been confirmed in the weeks following the shooting after Streicher's confidential conversation with a nonparty. Id. at 36. Streicher also stated that an internal affairs report had not yet been completed.

{¶5}   Respondent contends that he has provided the Enquirer with all the requested documents, except the officers' identifying information.   The Enquirer filed this mandamus action on December 22, 2010, seeking, pursuant to the Act, unredacted copies of the documents requested.

### Ohio Public Records Act

{¶6}   "Mandamus is the appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act."   *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶5, quoting *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶6.   "In order to be entitled to a writ of mandamus, the relator must establish a clear legal right to the relief prayed for, that respondent has a clear legal duty to perform the requested act, and that relator has no plain and adequate remedy at law."   *State ex rel. Seikbert v. Wilkinson*, 69 Ohio St.3d 489, 490, 1994-Ohio-39, 633 N.E.2d 1128.   "R.C. 149.43 is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records."   *Jones-Kelly*, 2008-Ohio-1770, ¶5, quoting *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 376, 1996-Ohio-214, 662 N.E.2d 334.

{¶7}   R.C. 149.43 defines "public record" as "records kept by any public office * * *."   Respondent does not dispute that the Cincinnati Police Department is a public office under the Act.   R.C. 149.43 also contains numerous exceptions to the definition of public record.   In withholding the identity of the officers from the Enquirer's requested documents, Respondent relies on the exception located in R.C. 149.43(A)(1)(v), which removes from the definition of public record, "[r]ecords the

release of which is prohibited by state or federal law[.]" "Exceptions to disclosure must be strictly construed against the custodian of public records, and the burden to establish an exception is on the custodian." *Hamilton Cty*, 75 Ohio St.3d at 376-77, citing *State ex rel. James v. Ohio State Univ.* (1994), 70 Ohio St.3d 168, 169, 637 N.E.2d 911, 912.

{¶8}    Neither party in this case has moved for summary judgment, nor has Respondent moved to dismiss the complaint for failure to state a claim, thus, this court sits as a trial court, "weighing the evidence properly before us and rendering a judgment on the merits of the complaint." *Roberts v. Winkler*, 176 Ohio App.3d 685, 692, 2008-Ohio-2843, 893 N.E.2d 534, ¶19.

### Due Process as an Exception to "Public Record"

{¶9}    Respondent asserts that withholding the wounded officers' identities is justified by the constitutional right recognized in *Kallstrom v. City of Columbus* (C.A.6, 1998), 136 F.3d 1055, which was adopted by the Ohio Supreme Court in *State ex rel. Keller v. Cox*, 85 Ohio St.3d 279, 1999-Ohio-264, 707 N.E.2d 931, because the officers and their family members are at risk of serious physical harm, and possibly even death, due to their involvement in the shooting. Releasing their identities, Respondent contends, would violate their rights to due process under the Fourteenth Amendment.

{¶10} In *Kallstrom*, the Sixth Circuit Court of Appeals held that the disclosure of police officers' personal information to criminal defense counsel implicated the officers' fundamental rights under the Due Process Clause. *Kallstrom*, 136 F.3d at 1060. In that case, three undercover Columbus police officers had been involved in an undercover investigation of a gang, which led to the

5

prosecution of 41 gang members on drug-related charges. Id. at 1059. In the course of the prosecution, defense counsel had requested and had received from the city copies of the officers' personnel files, pursuant to the Act. Id. The files contained the officers' personal information, including their home addresses, telephone numbers, drivers' licenses, bank account information, and family members' names. Id. The officers then brought an action against the city pursuant to Section 1983, Title 42, U.S. Code, because of the release of their information. Id. at 1059.

{¶11} The district court in *Kallstrom* had entered final judgment for the city, determining that the officers did not have a constitutionally-protected interest in the release of their personal information by the government. On appeal, the Sixth Circuit reversed the district court's judgment and held that the officers' "interests do indeed implicate a fundamental liberty interest, specifically their interest in preserving their lives and the lives of their family members, as well as preserving their personal security and bodily integrity." Id. at 1062. The Sixth Circuit stated, "it goes without saying that an individual's 'interest in preserving her life is one of constitutional dimension.' " Id. at 1063, quoting *Nishiyama v. Dickson Cty.* (C.A.6, 1987), 814 F.2d 277, 280 (en banc). The court saw "no reason to doubt that where disclosure of [the officers'] personal information may fall into the hands of persons likely to seek revenge upon the officers for their involvement in the [criminal] case, the City created a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives." Id.

{¶12} The court carefully noted that not every release of an officers' private information would rise to a constitutional level, "[b]ut where the release of private information places an individual at substantial risk of serious bodily harm, possibly

6

even death, from a perceived likely threat, the magnitude of the liberty deprivation strips the very essence of personhood." Id. at 1064 (internal quotation marks, ellipses, and citation omitted).

{¶13} After the *Kallstrom* court determined that the officers had a constitutionally-protected right in the nondisclosure of their personal information, the court applied the strict-scrutiny standard in determining whether the city's disclosure of the information was narrowly tailored to serve a compelling public purpose. Id. In making this determination, the court assumed that the purpose behind the Act—to shed light on the state government by allowing citizens to access public records—rose to the level of a compelling public purpose. Id. at 1065. Nevertheless, the court determined that the release of the officers' personal information by the city did not narrowly serve that purpose. Id. In reaching this conclusion, the court reasoned that the requesting party could not have sought the officers' personal information "in order to shed light on the internal workings of the Columbus Police Department." Id. The Sixth Circuit then remanded the case in part to the district court.[2]

{¶14} A year after the release of the *Kallstrom* decision, the Ohio Supreme Court released its decision in *Keller*, which relied on *Kallstrom* to affirm the dismissal of a mandamus action brought pursuant to the Act. In *Keller*, a federal public defender had requested a police officer's personnel files containing that officer's family members' names, telephone numbers, medical and beneficiary

---

[2] The district court had found initially that the release of the officers' addresses, telephone numbers, drivers' licenses, and family members' information created a substantial safety risk. The district court, however, had not made any findings as to whether the disclosure of polygraph tests, social security numbers, and financial account information "[p]ut the officers at substantial risk of serious bodily harm." *Kallstrom*, supra, at 1063. Thus, the Sixth Circuit remanded for further findings with respect to the release of this information.

7

information. *Keller*, 85 Ohio St.3d at 281. In affirming the denial of the requested writ, the supreme court reasoned that the officer's personal information "should not be available to a defendant who might use the information to achieve nefarious ends." Id. The court reasoned that the protection of the officer's constitutional rights, as recognized in *Kallstrom*, required such as result, and that "there must be a 'good sense' rule when such information about a law enforcement officer is sought by a defendant in a criminal case." Id. The court also noted that a defendant in a criminal case could still access information regarding an officer's job performance or discipline in internal affairs files. Id.

### Applying Kallstrom

{¶15} Respondent relies on *Kallstrom* in withholding the officers' identities from the requested documents citing the substantial risk to the officers' safety and the safety of their families. *Kallstrom* and *Keller* both dealt with public-records requests made by attorneys for criminal defendants—not members of the press. The Enquirer contends that *Kallstrom* requires an inquiry into the threat posed by the requesting party. Because the Enquirer journalists pose no direct threat to the officers' safety, the Enquirer argues that the holding in *Kallstrom* does not apply.

{¶16} In support of the Enquirer's contention, it relies in part on a passage from *Barber v. Overton* (C.A.6, 2007), 496 F.3d 449, in which the Sixth Circuit stated that *"Kallstrom* created a narrowly tailored right, limited to circumstances where the information disclosed was particularly sensitive and the persons to whom it was disclosed were particularly dangerous *vis-a-vis the plaintiffs."* Id. at 456 (emphasis in original). The Enquirer argues that the *Kallstrom* test requires a court to focus on the requesting party, and not the documents requested, in determining

8

whether a threat exists. The Enquirer contends that because it poses no direct danger to the officers' safety, *Kallstrom* does not create a bar to the release of the officers' identities to the Enquirer.

{¶17} We decline to adopt the Enquirer's limited application of the holding in *Kallstrom*. In *Kallstrom*, in addition to the criminal defense attorney's public-records request, the Police Officers for Equal Rights organization had made a similar request for the officers' personal information. *Kallstrom*, 136 F.3d at 1064. The Sixth Circuit reasoned that, although the district court had found that the organization itself did not pose a threat to the officers, disclosure even to that organization might pose an increased risk to the officers. Id. Therefore, the Sixth Circuit remanded the case to the district court to consider, in light of its opinion, the "severity of risks inherent in disclosure of information to the * * * organization[.]" Id.

{¶18} In *State ex rel. McCleary v. Roberts*, 88 Ohio St.3d 365, 2000-Ohio-345, 725 N.E.2d 1144, the appellee had requested information regarding an identification program maintained by the Columbus Parks and Recreation Department. Id. at 366. The identification program consisted of personal information, including addresses and photographs, of the children who had attended city-run pools. Id. at 368. The court held that the identification program did not meet the definition of "record" under the Act. Id. at 370. The court reasoned further that even if the identification program had been a "record," the requested information was exempt from disclosure pursuant to *Kallstrom* and *Keller*. Id. at 371. The court determined that children have a fundamental right to be free from abuse, and that the disclosure of the information would have placed the children "at

9

risk of irreparable harm, albeit not necessarily by appellee." Id. at 371. The *McCleary* court applied the *Kallstrom* analysis even though the requesting party posed no threat to the subjects of the records request. As a result, we conclude that the holding in *Kallstrom* may apply to bar disclosure of information requested from a public official, even though the requesting party poses no direct threat to the subjects whose information is contained in the requested records.

### Kallstrom II

{¶19} The Enquirer also suggests that *Kallstrom's* holding does not extend to news organizations, relying on the Southern District of Ohio's decision on remand in *Kallstrom v. City of Columbus* (S.D. Ohio 2001), 165 F.Supp.2d 686 ("*Kallstrom II*"). In *Kallstrom II*, various media organizations intervened in the case after the city of Columbus, citing *Kallstrom*, had denied the organizations' requests for the officers' home addresses, answers to personal history questions, and other information contained in police personnel records. Id. at 688. The district court held that the city had violated the First Amendment by denying the media organizations' public records request. Id. at 695. The court stated that "[t]o deny members of the press access to public information solely because they have the ability to disseminate it would silence the most important critics of governmental activity. This not only violates the Constitution, but eliminates the very protections the Founders envisioned a free press would provide." Id. at 688.

{¶20} *Kallstrom II* is clearly distinguishable. In *Kallstrom II*, the city denied the media organizations' requests for the officers' information because of the organizations' ability to disseminate that information to the public, including to the criminal defendants who posed the safety risk. Id. at 697. The district court

10

reasoned that although the First Amendment does not create "a right of access to government information or sources of information within the government's control[,] [t]he Constitution, however, assures 'the public and the press equal access once the government has opened its doors.' " Id., quoting *Houchins v. KQED, Inc.* (1978), 438 U.S. 1, 15-16, 98 S.Ct. 2588 (internal citation omitted). Thus, the district court reasoned, "the government may not single out the press to bear special burdens without violating the First Amendment." *Kallstrom II*, 165 F.Supp.2d at 697, citing *Minneapolis Star & Tribune Co. v. Minnesota Commr. of Revenue* (1983), 460 U.S. 575, 585-86, 103 S.Ct. 1365. The district court applied these First Amendment principles to the media organizations' requests and determined that the city had treated the organizations differently because of their ability to disseminate the information, which "suggest[ed] that the same records would have been provided to anyone who did not have this capability[,]" such as any other member of the public. *Kallstrom II*, 165 F.Supp.2d at 699.

{¶21} We recognize that the media serve an important role in our society as government watchdogs, and we are mindful of the First Amendment concerns that may be raised when a government entity refuses to disclose information to a member of the press. But unlike the city's actions in *Kallstrom II*, Respondent's failure to disclose the identities of the officers involved in the Iron Horsemen shooting to the Enquirer does not violate the First Amendment. The disparate treatment of the media organizations as compared to any other member of the public, which occurred in *Kallstrom II*, is not present in this case. The record does not reflect that Respondent distinguished between the Enquirer and any other member of the public in refusing to release the requested information. Therefore, we conclude that the

11

First Amendment is not implicated by Respondent's failure to disclose the records to the Enquirer.

### *The Journalist Exception*

{¶22} The Enquirer argues that *Kallstrom's* holding does not apply to its journalists because the Act was amended to account for the holding in *Kallstrom*. Further, the Enquirer argues that the Act expressly permits journalists to access the information requested. In 2007, the Act was amended, and, pursuant to R.C. 149.43(A)(7), certain categories of police officers' personal information, including residential and familial information, are now specifically excluded from the definition of "public record." In R.C. 149.43(B)(9), the Act contains what the Enquirer refers to as a "journalist exception," which the Enquirer contends allows journalists to examine police officers' personnel records.

{¶23} R.C. 149.43(B)(9) provides, in part, that a public office must disclose the residential address of a peace officer to a journalist upon written request. The journalist exception, however, does not create a broad right of access to police officers' personnel files. Moreover, the statute cannot supplant the right recognized in *Kallstrom*—a right derived from the federal constitution, see, e.g., *In re D.B.*, 129 Ohio St.3d 104, 2011-Ohio-2671, 950 N.E.2d 528, ¶29-31, and explicitly recognized by the Ohio Supreme Court in *Keller*. Because we have determined that the holding in *Kallstrom* may apply despite the journalist exception in the Act, we next consider whether Respondent has met his burden in demonstrating that *Kallstrom* applies to the disclosure of the officers' identities.

### *The Officers' Constitutional Rights*

{¶24} In applying *Kallstrom*, a court must determine whether the public entity has met its burden in showing that the release of the requested information places an individual at substantial risk of physical harm from a perceived likely threat. *Kallstrom*, 136 F.3d at 1064. In this case, Respondent contends that the release of the officers' identities would create a safety risk to those officers and their families from retaliatory actions. Respondent primarily relies on the testimony of Streicher and affidavits from the two wounded officers, which were filed under seal.

{¶25} The Enquirer alleges that Respondent has not carried his burden in showing the existence of a threat. The Enquirer analogizes the case at bar to *Kallstrom II* where the district court ultimately concluded that the officers did not have a constitutional interest at stake in the disclosure of their polygraph tests, social security numbers, and financial account information, because the evidence in the record suggested that the threat to those officers by the criminal defendants no longer existed. *Kallstrom II*, 165 F.Supp.2d at 695.

{¶26} The Enquirer makes various arguments in response to Respondent's assertion that the officers' fundamental rights are implicated by disclosure of their identities. For example, the Enquirer contends that (1) the officers in this case were not "embedded" undercover officers actively investigating an ongoing matter, but were merely plainclothes officers who responded to JD's Honky Tonk because they were most readily available; (2) no history of violence exists between the Iron Horsemen and the Cincinnati police; (3) the police department's investigation had concluded and no retaliation attempts had been made; (4) the plainclothes officers involved in the shooting were at no greater risk of harm than the uniformed officers;

13

and (5) Respondent relies on portions of Streicher's testimony that constitute inadmissible hearsay evidence, which cannot be considered in determining whether the officers have a constitutional right implicated by the disclosure of their identities.[3]

{¶27} As to the Enquirer's argument that Respondent relies on inadmissible hearsay, because we act as the trial court in this original action, we consider only admissible evidence in determining whether an exception to the Act applies. Loc.R. 33.2. The portion of Streicher's testimony to which the Enquirer objects have been filed under seal pursuant to a protective order from this court. In general, the confidential portions of Streicher's testimony, which the Enquirer argues is objectionable, involves a conversation that Streicher had with a nonparty after the shooting occurred.

{¶28} We are not convinced by the Enquirer's argument that Streicher's testimony regarding his conversation with a nonparty constitutes hearsay. Evid.R. 801 defines hearsay as "[a] statement, other than one made by the declarant while testifying * * *, offered in evidence to prove the truth of the matter asserted." Because *Kallstrom* speaks of a "perceived likely threat," that portion of Streicher's deposition testimony in which he recounts a conversation with a nonparty (and what that nonparty had been told by others) can properly be considered by this court to illustrate Streicher's perception of a threat. When viewed in this manner, Streicher's testimony has not been offered for the truth of the matter asserted, i.e. to show that a

---

[3] We note that the Enquirer makes other arguments in support of its contention that Respondent has not met his burden in establishing a threat under *Kallstrom*, and although we have considered those arguments, we will not discuss them in this decision because they rely on confidential portions of Streicher's deposition testimony.

threat actually exists, but to show Streicher's perception that a threat exists. Therefore this testimony does not constitute hearsay.

{¶29} Further, Respondent has provided sufficient evidence to justify his reliance on the holding in *Kallstrom* even in the absence of the challenged testimony. Fourteen Cincinnati police officers were involved in a deadly and injurious gun battle with the Iron Horsemen—a known outlaw group—that left one of the Iron Horsemen members dead and two officers wounded. As a result of the shootout, only one Iron Horsemen member was charged on a gun-related offense, and so the wounded officers have not been identified in any court proceedings. Respondent has continued to conceal the officers' identities from the public.

{¶30} Finally, Streicher, the former police chief for the city, testified that he perceives that a serious threat exists to those officers and their families, which is uncontroverted in the record. The wounded officers also filed affidavits in support of nondisclosure of their identities. The evidence in the record sufficiently establishes that disclosure of the officers' identities to the public would place the officers and their family members at substantial risk of serious physical harm from a perceived likely threat, which implicates the officers' fundamental rights under the Due Process Clause of the Fourteenth Amendment.[4]

### Strict Scrutiny

{¶31} Even though we have determined that the officers' fundamental rights are implicated by the disclosure of their identities, Respondent's disclosure will not violate the Due Process Clause if the disclosure is narrowly tailored to further a

---

[4] We do not reach the question of whether the Ohio Constitution confers the same or greater rights than provided by the United States Constitution. See, e.g., *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶76.

compelling state interest. *Kallstrom*, 136 F.3d at 1064. Just as the court in *Kallstrom*, "[w]e assume that the interests served by allowing public access to agency records rises to the level of a compelling state interest." Id. at 1065. Therefore, we must balance the officers' interest as asserted by Respondent in avoiding disclosure with the public's interest in accessible government. Id. at 1061, citing *J.P. v. DeSanti* (C.A.6, 1981), 653 F.2d 1080, 1091. We recognize that in public-records cases, the General Assembly generally sets the balance between public-policy concerns and private interests, see, e.g., *State ex rel. WBNS TV, Inc. v. Dues*, 101 Ohio St.3d 406, 2004-Ohio-1497, 805 N.E.2d 1116, ¶36; however, such balancing in this instance is properly conducted by courts pursuant to *Kallstrom*.

{¶32} The Enquirer asserts that the officers' identities should be unveiled to the public to shed light on how the incident at JD's Honky Tonk started, and whether the police acted appropriately. The Enquirer further contends that the public has a right to understand the police department's decision-making process with regard to gang violence. The parties' counsel agreed at oral argument that all the requested documents had been disclosed, except that the officers' identities had been redacted. As a result, we fail to see how Respondent's disclosure of the individual officers' identities, in light of Respondent's numerous other disclosures, would further answer the Enquirer's questions. Nevertheless, we determine that the officers' interest in protecting themselves and their families from serious bodily harm outweighs the public's interest in uncovering the individual officers' names. Therefore, the disclosure of the officers' identities in this situation is not narrowly tailored to further achieve the public purpose of examining the inner-workings of the government.

16

{¶33} In conclusion, we hold that the exception articulated by the court in *Kallstrom* applies to the officers' identifying information in the records requested by the Enquirer, and Respondent is not required to disclose the identity of the officers to the Enquirer. As a result, the Enquirer's requested writ is denied.

### *Attorney Fees*

{¶34} The Enquirer also requests attorney fees for pursuing this action. Because we have determined that the Enquirer is not entitled to the requested writ of mandamus under the Act, its request for attorney fees is denied. See, e.g., *State ex rel. Cranford v. Cleveland*, 103 Ohio St.3d 196, 2004-Ohio-4884, 814 N.E.2d 1218, ¶25. Moreover, courts exercise discretion in awarding attorney fees to successful requesting parties in public-records cases, and "[i]n exercising discretion in this determination, 'courts consider the reasonableness of the government's failure to comply with the public records request and the degree to which the public will benefit from release of the records in question.' " *Dues*, 2004-Ohio-1497, ¶47, quoting, *State ex rel. Wadd v. Cleveland* (1998), 81 Ohio St.3d 50, 54, 1998-Ohio-444, 689 N.E.2d 25. Both parties and their counsel in this case performed admirably and acted reasonably in light of the circumstances, and even if the Enquirer had been granted the requested writ, attorney fees would not be proper.

Writ Denied.

HILDEBRANDT, P.J., and SUNDERMANN, J., concur.

Please Note:

The court has recorded its own entry on the date of the release of this opinion.