**Pamela L. McGINNIS, et al., Plaintiffs,**

**v.**

**UNITED STATES AIR FORCE, et al., Defendants.**

**No. C–3–94–30.**

United States District Court, S.D. Ohio, Western Division.

Jan. 21, 2003.

David Torchia, Paul Tobias, Cincinnati, OH, for plaintiffs.

Telin Ozier, Rosslyn, VA, for Defendants.

EXPANDED OPINION AND ENTRY SETTING FORTH THE REASONING AND CITATIONS OF AUTHORITY FOR THE COURT'S OPINION OF MARCH 24, 2000 (DOC. # 116), WHICH SUSTAINED IN PART AND OVERRULED IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 99); CONFERENCE CALL SET

RICE, Chief Judge.

Plaintiffs Pamela McGinnis ("McGinnis") and Charlene Reynolds ("Reynolds") are African-American civilian employees with the United States Air Force ("USAF"). At all relevant times, Plaintiffs were employed as GS-346-11 Logistics Management Specialists with the Air Force Security Assistance Center ("AFSAC") at Wright Patterson Air Force Base. They allege that, while employed by the USAF, they have suffered "an ongoing pattern of discrimination." On January 24, 1994, Plaintiffs initiated the instant litigation, setting forth claims of race discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended; violation of their Constitutional right to privacy; and violations of the Privacy Act (Doc. # 1). Plaintiffs subsequently filed three Amended Complaints (Doc. # 2, Doc. # 18, Doc. # 43). Their Second Amended Complaint (Doc. # 18) set forth three claims for relief, to wit: (1) a claim for race and national origin discrimination, in violation of Title VII, due to (a) being assigned low visibility projects, (b) being refused training necessary for career advancement, (c) being refused assignments to temporary duty (TDY's) necessary for career advancement, (d) being subject to discipline and criticism for acts for which similarly situated white employees were not disciplined, and (e) being rated below similarly situated white employees for their 1991 and 1992 appraisals; (2) a claim that confidential information about them was revealed, in violation of the Privacy Act and their Constitutional right to privacy; and (3) a claim by McGinnis for retaliatory discharge, in violation of Title VII, due to her EEO activities. Plaintiffs' Third Amended Complaint added a jury demand.

On June 21, 1996, McGinnis requested leave to file an additional Amended Complaint, which the Court granted on June 26, 1996. However, rather than file her proposed Fourth Amended Complaint, McGinnis filed a new action, Case Number C-3-96-236, alleging that subsequent to her reinstatement, she had been subject to retaliation in the form of lower appraisals,

assignment of lower-graded work, and comments by her supervisor.[1] On August 22, 1996, the Court ordered that Case Number C-3-96-236 be consolidated with Plaintiffs' initial lawsuit (Doc. # 54). On September 30, 1996, McGinnis initiated another lawsuit, Case Number C-3-96-383, in which she alleged that, on or about July 17, 1995, she received a performance appraisal that "did not meet Plaintiff's expectations, was not an accurate report of her performance, and was motivated by illegal factors such as Plaintiff's race and protected activities." (Compl. 96-383, ¶ 5-6). On March 6, 1997, this action was likewise consolidated with C-3-94-30 (Doc. # 64).

On February 8, 1995, Defendants filed a Motion to Dismiss or, in the alternative, for Summary Judgment (Doc. # 19). The Court sustained in part and overruled in part that Motion, dismissing Plaintiffs' national origin discrimination claim and their request for punitive damages (Doc. # 32). On March 16, 1999, following the conclusion of discovery, Defendants filed a Post-Discovery Motion for Summary Judgment (Doc. # 99). On March 24, 2000, the Court sustained in part and overruled in part that Motion, indicating that it would set forth its reasoning and citations of authority in a subsequent Expanded Opinion. The Court does so at this time.

I. *Factual Background*

Throughout their employment, Plaintiffs were employed as GS-346-11 "Case Managers," working on programs with foreign militaries. For the most part, the programs were staffed with a GS-346-12 Program Manager and a GS-346-11 Case Manager. Plaintiffs indicate that it was not unusual for a program not to have a GS-346-12 Program Manager for months at a time and, during those periods, a GS-346-11 Case Manager could run the program in his or her stead.

A. *Charlene Reynolds*

Reynolds was hired as a Case Manager in May of 1989. Upon her employment, Reynolds worked in the Acquisition Branch of the AFSAC. Between May, 1989, and August, 1989, she was assigned to work on the Pacer Forge project, following which she worked on the Peach Vector II project (August 1989-February 1990). (Admin. R. at 488-95) In February of 1990, Reynolds was moved to the Pacer Chariot program, a project which she asserts has "low visibility." [2] Between 1989 and late 1991, she sought to receive training through AFIT/DISAM and through long-term full-time (LTFT) schooling. She states that she was denied training in 1989, 1990, and 1991. In January of 1991, Plaintiff was investigated for an incorrect travel voucher following a TDY in Cairo, Egypt. Reynolds alleges that her supervisor, Georgetta Knight, disciplined her for the voucher, because she complained to upper management about being treated poorly by Ms. Knight while in Egypt.

In July of 1991, Plaintiff received her annual performance review, which was

1. In her response to Defendant Widnall's Interrogatories, Plaintiff indicated that Lieutenant Colonel Collins' retaliatory comment was: "How do I appraise you when you're going to all those meetings (EEO, lawyer, etc.)?"

2. According to Plaintiffs, a low visibility program is one that is not briefed often to higher level management and is not a high dollar program (See McGinnis Depo., Def.'s Ex. 15 at 5). In her deposition, McGinnis stated that visible cases were problem cases, "because if it was a problem you had to hire up commanders and generals at the EAF, Egyptian Air Force Base." (McGinnis Depo. at 139). Other visible cases were new buys/new acquisitions, and highly visible cases could be those which involved large amounts of money (*id.*).

signed by Mr. Darrell Williams, her first-level supervisor, and by her second-level supervisor, Colonel William Moravek. Plaintiff received a narrative rating of "Fully Successful." In July of 1992, Plaintiff received a "Superior" rating, but did not receive the highest possible numerical score. The 1992 evaluation was signed by her first-level supervisor, Mr. Williams, and by her second-level supervisor, Lieutenant Colonel Richard J. Loewenhagen. Reynolds indicates that Mr. Williams informed her that Colonel Moravek told him how to rate his employees and that Reynolds did not receive the highest possible score due to her "color." Reynolds alleges that each of the above actions by Defendants impaired her promotional opportunities.

On July 30, 1992, Reynolds, along with Plaintiff McGinnis, contacted the USAF EEO Office, alleging that they had been subject to discrimination based on their race, color, and national origin, and that they had suffered retaliation due to prior EEO activity. Specifically, Plaintiffs alleged discrimination in promotions, temporary duty, training, disciplinary action, personal documentation, and their 1991 and 1992 performance appraisals. The administrative complaint was initially submitted as a class complaint, with Plaintiffs remaining anonymous. In October of 1992, Plaintiffs were informed by a former employee, Ms. Sharymayne Windsor, that Mr. Thomas Ranney had told her that Plaintiffs had filed a class action EEO complaint. Mr. Ranney is the spouse of Ms. Lynne Ranney, Chief Counselor of the EEO Office. The complaint was later converted to individual complaints by Reynolds and McGinnis.

In January of 1993, nine individuals were selected for promotion to GS–346–12 positions. The individuals were selected from a list of eligible employees, who were ranked according to a "promotion evaluation pattern." Due to the number of positions available, a Merit Promotion Certificate and a Supplemental Certificate were created from the eligibility list. Each certificate contained ten names. Reynolds was not on the list of eligible employees, because she did not satisfy the "time-in-grade" requirement for promotion. Consequently, she was not promoted to a GS–346–12 position at that time. Nine Caucasian employees were promoted. On January 27, 1993, Reynolds again contacted the EEO Office, alleging that she had not been considered for promotion due to her race and national origin.

In February of 1993, the Program Manager for the Pacer Chariot program was reassigned. Between February and July of 1993, Reynolds performed the Program Manager duties, but she did not receive credit or pay for that work. In July, 1993, Reynolds submitted an EEO Complaint, alleging that the failure to give her a temporary promotion was discriminatory. On August 30, 1993, Reynolds was credited with a detail to the GS–346–12 position for the time period February 1, 1993, to July 6, 1993.

In December of 1993, Citicorp notified the USAF that certain employees were past due on their Diner's Club credit cards, which were issued to employees under the Diner's Club Program [3] (Doc. # 99, Def.Ex. 4). On April 13, 1994, Reynolds received a Notice of Proposed Removal, signed by her supervisor, Major Harris. Her employment with the USAF was terminated on June 10, 1994. In response,

3. To alleviate the necessity of providing travel advances, the Air Force had entered into a program by which employees could obtain government-sponsored Citicorp Diner's Club credit cards, which were to be used for government business only.

Reynolds filed another complaint with the EEO office and appealed her termination to the Merit Systems Protection Board ("MSPB"). Following the MSPB's decision on McGinnis' termination for credit card abuse (*see, infra*), Reynolds settled her complaint for reinstatement with a 60–day suspension.

B. *Pamela McGinnis*

McGinnis began her employment with AFSAC in 1988. From 1988 to March of 1992, Plaintiff McGinnis was employed in the Follow–On Support Branch of the Egyptian Program, working on the C–130 Program, a program which Plaintiff alleges is a "low visibility program." (Admin.R.677) In December of 1990, McGinnis allegedly was informed by her supervisor, John Rodgers, that she would not be permitted to have temporary duty to Egypt for the Security Assistance Management Review, because her program was not visible enough. (Admin.R.696). In July of 1991, McGinnis received her annual performance review, which rated her "Fully Successful." In 1992, she was reassigned to the Acquisition Branch, working on the ACMI Program (Admin.R.366). Plaintiff's July, 1992, performance appraisal rated her as "Excellent." She alleges this rating is artificially low, and that she should have received a "Superior" rating, the highest rating possible (McGinnis Depo. at 211).

From July, 1992, until September, 1992, McGinnis was temporarily promoted to a GS–346–12 position. She continued to work at a GS–346–12 level from October 1, 1992, until July 6, 1993. In December of 1993, McGinnis was retroactively given credit for that work as a detail to a GS–346–12 position.

In January of 1993, McGinnis learned that nine Caucasians had received promotions to a GS–346–12 position. Plaintiff had satisfied all the eligibility requirements for promotion, and she was ranked 23rd among eligible employees. The names of the top twenty individuals were placed on the Merit Promotion Certificate and the Supplemental Certificate and were forwarded to the promotion committee. Plaintiff was not selected for promotion, ostensibly because she was not among the top twenty individuals. McGinnis alleges that her ranking was low, due to the prior discriminatory performance evaluations and the failure to provide her training and travel opportunities. She alleges that had she previously been treated fairly, she would have ranked the same as two Caucasian employees who received promotions.

In December of 1993, the USAF was informed that $3,725.31 was past due on McGinnis' Diner's Club credit card. McGinnis' supervisor, Mr. Darrell Williams, Chief of Egyptian Acquisitions Program, was contacted by Employee Relations, which indicated that McGinnis had misused her credit card. The USAF had determined that between June 7, 1993, and October 13, 1993, Plaintiff had made twenty-five (25) unauthorized purchases, totaling more than $6,500. On March 4, 1994, Mr. Williams issued a Notice of Proposed Removal for her personal use of the credit card. On April 1, 1994, McGinnis responded to the charges via correspondence, presenting mitigating arguments. Upon consideration of Plaintiff's response, Colonel Victor Hardin, Director of European, African, and Near Eastern Programs, agreed with the proposal to remove Plaintiff, and on May 12, 1994, he signed a letter to that effect. On May 17, 1994, McGinnis was removed from her position as a Logistics Management Specialist.

McGinnis appealed her termination to the Merit Systems Protection Board. She argued that her removal was discriminatory, in that the action was taken because of her race. The MSPB found that McGinnis

had not demonstrated that her termination was retaliatory. However, it concluded that termination was an unreasonably severe penalty. The MSPB ordered that the removal be canceled, and that Plaintiff be given a 60-day suspension without pay.

As a result of the MSPB Decision, McGinnis was reinstated in September of 1994. She returned to duty on November 15, 1994, and was assigned to the Netherlands Office. Plaintiff alleges that, after returning to duty, she did not receive any meaningful work, despite her repeated requests for same. On May 15, 1995, McGinnis began training to serve as a Reduction-in-Force ("RIF") monitor and Union Steward. Thereafter, she began full-time employment with the Union. In July of 1995, Plaintiff received a performance evaluation, signed by Major Leventis, in which she was rated "Fully Successful."

II. *Standard Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires

the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure,* § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment....") Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. *Defendants' Motion for Summary Judgment (Doc. # 99)*

In their Motion, Defendants assert that they are entitled to summary judgment on each of Plaintiffs' claims. With regard to Plaintiffs' allegations of wrongful conduct occurring prior to June of 1992, Defendants assert that Plaintiffs have failed to exhaust their administrative remedies. As for Plaintiffs' discrimination claims, the government asserts that McGinnis and Reynolds cannot establish a *prima facie* case. Defendants further argue that McGinnis cannot establish a *prima facie* case that she suffered retaliation. In addition, Defendants contend that Plaintiffs' Privacy Act claims must be dismissed, because they cannot prove compensable damages, and that their Constitutional claim must fail, as a matter of law.

#### A. *Reynolds' Title VII Discrimination Claims*

Plaintiffs claim that they suffered race discrimination, in violation of Title VII. Under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff must first establish a *prima facie*

case of discrimination.[4] In order to establish a *prima facie* case of racial discrimination, the plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) other similarly situated employees, who were not members of the protected class, were treated differently. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992); *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir.2000).

Once the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant offers such a legitimate reason, the burden of production shifts back to the plaintiff to demonstrate that the defendant's reason is not real, but a pretext. *Id.; McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817. The plaintiff may meet this burden by showing (1) that the stated reasons had no basis in fact, (2) that the stated reasons were not the actual reasons, or (3) that the stated reasons were insufficient to explain defendant's action. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). The burden of persuasion, however, always remains with the plaintiff. *See Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

1. *Failure to Promote Claim*

Reynolds asserts that she was discriminated against in the promotional process, in that she did not receive a promotion to a GS–346–12 position in January of 1993, and that she did not receive a promotion to the Program Manager position for the Pacer Chariot program (Doc. # 107 at 20). In their Motion, Defendants assert that Reynolds cannot satisfy her *prima facie* case of discrimination, because she was not qualified for a promotion to a GS–346–12 position in January, 1993, in that she did not satisfy the "time-in-grade" requirement and, therefore, was not eligible for promotion. In response, Reynolds does not contest that she did not meet the time-in-grade requirement. Rather, she focuses on the Pacer Chariot GS–346–12 position, and argues that another employee, a Caucasian, was treated differently. In particular, Reynolds asserts that Ms. Diane Crevonis, a GS–346–11 employee on a different program, "was assured the GS–346–12 job on her program once she obtained the necessary time in grade." (Doc. # 107 at 20).[5] In contrast, Plaintiff did not receive the GS–346–12 position on the Pacer Chariot program, the program on which she worked, once she had the necessary time in grade.

With regard to the January, 1993, promotions, Plaintiff has not provided any evidence that she was eligible for promotion, nor has she provided any evidence that other non-eligible employees were considered during that promotion process. Accordingly, she cannot demonstrate a *prima facie* case that the failure to consid-

4. Of course, Plaintiffs may, instead, provide direct evidence of racial discrimination.

5. In their Reply Memorandum, Defendants attach an affidavit by Diane Crevonis (now Diane Halvorsen), who denies being assured of the GS–346–12 position. She states that she was promoted to the GS–346–12 position after participating in a competitive selection process. Because the issue of Ms. Crevonis' promotion is contested and the Court must construe the evidence in the light most favorable to Plaintiff, the Court will accept Plaintiff's assertion that Ms. Crevonis was assured the position.

er her for promotion was discriminatory. Defendants are entitled to summary judgment for her failure to promote claim, based on the January, 1993, selections.

As for her failure to be selected for a GS-346-12 position for the Pacer Chariot program, even assuming that Ms. Crevonis was assured her GS-346-12 position, Plaintiff has not provided evidence that she was similarly situated. The Sixth Circuit has held that a plaintiff must show that the "comparables" are substantially similar in all respects. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992). "Thus to be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.; Gray v. Toshiba America Consumer Products, Inc.*, 263 F.3d 595, 599 (6th Cir.2001).

Herein, Reynolds has indicated that Ms. Crevonis worked on a different program. There is no evidence that they worked for the same supervisor, or that the two programs required individuals with similar qualifications. In other words, there is no evidence whatsoever that there is any relationship between Ms. Crevonis' promotion and Reynold's nonselection. Moreover, Reynolds has provided no evidence to indicate the means by which an individual was selected for the Pacer Chariot Program Manager position. There is no evidence that Reynolds was qualified for the GS-346-12 position in the Pacer Chariot program at the time that a Caucasian was selected, nor is there any evidence that she applied for that position. Accordingly, Plaintiff has failed to establish a *prima facie* case that she was discriminated against on the basis of race when Defendants failed to promote her to a GS-346-12 position. Defendants' Motion for Summary Judgment on Reynold's failure to promote claim, based on both her failure to receive a promotion to a GS-346-12 position in January, 1993, and her failure to receive the GS-346-12 position on the Pacer Chariot program, is SUSTAINED.

2. *1992 Performance Appraisal*

In her Amended Complaint, Reynolds asserts that she was discriminated against, on the basis of race, in her 1992 performance appraisal. The 1992 performance review rated Plaintiff on nine categories, using a scale of 1 (the lowest) to 9 (the highest). Thus, the highest possible score for an employee was 81. Reynolds received a 9 score in four categories: Work Effort, Adaptability to Work, Problem Solving and Work Management. She received an 8 score in five categories: Working Relationships, Communication, Work Productivity, Self-Sufficiency and Skill in Work. Thus, Reynolds' cumulative score was 76 out of a possible 81. In terms of overall performance, the evaluation form provided five possible ratings: Unacceptable (lowest), Minimally Acceptable, Fully Successful, Excellent, and Superior (highest). Plaintiff was assessed as Superior, which is defined as "Employee exceeds all of the elements of the performance plan." Plaintiff's 1992 appraisal was signed by Mr. Darrell Williams. (Pl.'s Ex.)

Defendants assert that Reynolds cannot establish a *prima facie* case that she suffered discrimination in her 1992 performance evaluation. *First,* they assert that Plaintiff cannot demonstrate that she was treated worse than non-minorities. *Second,* they argue that the evaluation did not constitute an adverse employment action. Reynolds acknowledges that, on its

face, the Superior rating is high praise. However, she argues that the numerical total she received was artificially low and that, but for her race, she would have received a higher score.

In support of her argument that the evaluation was discriminatory, Plaintiff argues that she has direct evidence of discrimination by Defendants. She states, in her affidavit, that she was told by her first-level supervisor, Mr. Williams, that he was told by Colonel Moravek how to rate his people, and that the reason Reynolds did not receive a higher numerical score was because of her "color." (Reynolds Aff. ¶ 4f).

The Court agrees with Plaintiff that this is direct evidence of discrimination. In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in an employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have taken the employment action against the employee, even if it had not been motivated by impermissible discrimination. *Id.; Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)(plurality opinion); *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081 (6th Cir.1994). Because Plaintiff herein has presented direct evidence that her 1992 evaluation was lower due to her race, she need not demonstrate that other similarly situated non-minorities were treated differently.

Although the burden-shifting analysis set forth in *McDonnell Douglas* does not apply in a direct evidence situation, Reynolds is not relieved of the burden of demonstrating that Defendants took an adverse employment action against her. "Even where there is direct evidence of discriminatory comments or remarks, the plaintiff may not prevail unless she shows an actionable injury." *Handshoe v. Mercy Medical Ctr.,* 34 Fed.Appx. 441, 445, 2002 WL 649070, *4 (6th Cir.2002). An adverse employment action typically must constitute "a materially adverse change in the terms of ... employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885–86 (6th Cir.1996)(quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)); *Dawson v. Airtouch Cellular,* 42 F.Supp.2d 767, 771 (S.D.Ohio 1999)(Marbley, J.)(granting summary judgment where plaintiff had not alleged that she lost any salary, seniority or benefits, or received a less distinguished title or fewer responsibilities as a result of alleged discriminatory remarks); *Joiner v. Ohio Dep't of Transp.,* 949 F.Supp. 562, 567 (S.D.Ohio 1996) (no adverse employment action, despite loss of overtime and supervisory responsibilities, because no change in pay or benefits and no other conditions existed which would make working conditions intolerable).

"A performance evaluation that is lower than an employee feels is warranted is not an adverse employment action sufficient to state a claim of discrimination." *Primes v. Reno,* 190 F.3d 765, 767 (6th Cir.1999)("fully successful" evaluation was not adverse employment action); *Dowell v. Rubin,* 221 F.3d 1334, 2000 WL 876767, *2 (6th Cir.2000) (rejecting plaintiff's claim, because he did not allege any adverse consequence arising from his above-average performance appraisal); *Clark v. Alcan Aluminum Corp.,* 41 Fed.Appx. 767, 2002 WL 1691447 (6th Cir.2002); *Booker v. Budget Rent–A–Car,* 17 F.Supp.2d 735, 751 (M.D.Tenn.1998) ("[M]ost courts have

concluded that negative performance evaluations cannot standing alone constitute an adverse employment action."); *Elkheir v. Ashcroft,* 28 Fed.Appx. 506, 2002 WL 169611 (6th Cir.2002) (plaintiff failed to established a *prima facie* claim of discrimination, because he did not allege any adverse consequence arising from his 1997 performance rating of "fully successful."). As expressed by the Sixth Circuit, "[i]f every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes,* 190 F.3d at 767. However, "negative evaluations can be used as evidence of an adverse employment action, particularly when they contribute to an employee's demotion, disadvantageous transfer of positions, or failure to promote." *Booker,* 17 F.Supp.2d at 751.

In the present case, Reynolds has neither argued nor presented evidence that the 1992 performance appraisal constituted an adverse employment action. She has not demonstrated that the appraisal affected any terms or conditions of her employment. For example, she has not provided evidence that she received less pay or received worse assignments as a direct result of that appraisal. In addition, she has not argued that the 1992 evaluation affected her ranking on the Merit Promotion Certificate for the 1993 promotions to GS 346 12, or that she was denied any other promotions, pay increases, or other benefits as a result of the evaluation. Consequently, Plaintiff has not suffered any harm from the alleged discriminatory evaluation. Accordingly, Plaintiff cannot prevail, as a matter of law, on her claim based on her 1992 performance review. Defendants' Motion for Summary Judgment on that claim is SUSTAINED.

3. *Pre-1992 Alleged Discriminatory Conduct*

In the Second Amended Complaint, Reynolds alleges that Defendants discriminated against her in 1991, on the basis of race, by providing her with a performance appraisal that rated her lower than similarly situated Caucasian employees. She further alleges that she was placed on low visibility projects, that she was refused training opportunities, and that she was subject to discipline and criticisms for acts for which similarly situated Caucasians were not disciplined.[6] In her Memorandum in Opposition to Summary Judgment (Doc. # 107), Plaintiff clarified these allegations, stating that, prior to July of 1992, she was told that she needed to have a college degree in order to be hired in the Schedule B program when, in fact, other Caucasian Schedule B employees did not have degrees. Reynolds further asserted that she was ignored by her supervisor during her first overseas trip, and that after she complained of race discrimination, her supervisor retaliated against her.

In their Motion, Defendants assert that Reynold's claims which occurred more than thirty (30) days prior to the day on which she contacted an EEO counselor are untimely and are barred for failure to exhaust administrative remedies. In response, Reynolds asserts, in a footnote, that her 1991 performance appraisal is a "continuing violation."

6. Plaintiff also alleged that she was refused assignments to temporary duty (TDY's). However, unlike her other allegations, Plaintiff has indicated that the refusal to allow her TDY's constitutes background evidence, and that they are not independent claims for liability. Accordingly, the Court need not address whether they are continuing violations for which liability can be assessed.

Federal employees must exhaust their administrative remedies under Title VII before bringing suit in federal court. *See Haithcock v. Frank,* 958 F.2d 671, 675 (6th Cir.1992). At the time of the events giving rise to this litigation, federal employees were required to contact an EEO counselor within thirty days of the alleged discriminatory action.[7] If complainants failed to meet this time limit, their complaints are subject to dismissal. See 29 C.F.R. § 1614.107(a)(2), (b).

The "continuing violation" doctrine provides that when "there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." *Haithcock v. Frank,* 958 F.2d 671, 677 (6th Cir.1992). In other words, when a continuing violation is shown, "a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Alexander v. Local 496, Laborers' Int'l Union of N. Am.,* 177 F.3d 394, 408 (6th Cir.1999).

In *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court recently clarified the application of the continuing violation doctrine to Title VII claims. Writing for the Court, Justice Thomas reviewed Title VII's statutory language, which requires complainants file charges of discrimination within the specified number of days after an "unlawful employment practice." He noted that "practice" has repeatedly been interpreted to apply to a discrete act or single occurrence, even when it has a connection to other acts. *Id.* 536 U.S. at 110–11, 122 S.Ct. at 2070–71. He further noted that prior cases have held that discrete acts that fall within the statutory time period do not make acts that fall outside the time period timely. From these sources, the Court derived several principles:

> First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Id.* The Supreme Court expressly rejected applying the continuing violations doctrine to "serial violations." [8]

In the present case, Reynolds (and McGinnis) contacted an EEO counselor on July 30, 1992. Thus, any alleged discriminatory event that occurred prior to July of 1992 is subject to dismissal for failure to exhaust administrative remedies in a timely manner. Plaintiff has raised, in a footnote, the issue that her 1991 performance

7. Federal Employees now have forty-five days to contact an EEO counselor. 29 C.F.R. § 1614.105(a)(1).

8. The Supreme Court distinguished claims of discrete actions of discrimination from hostile environment claims. It held that the continuing violation doctrine is applicable to hostile environment claims, because "[t]heir very nature involves repeated conduct" and "[s]uch claims are based on the cumulative affect [sic] of individual acts." 536 U.S. 101, 114, 122 S.Ct. 2061, 2072, 153 L.Ed.2d 106.

appraisal falls within the continuing violation doctrine, but she has failed to provide any arguments in support of that assertion.[9] Construing the evidence in the light most favorable to Plaintiff, Reynolds has not timely exhausted her administrative remedies regarding her 1991 performance appraisal. That evaluation constitutes a discrete act of discrimination, for which the continuing violations doctrine is inapplicable. Plaintiff therefore was required to file a timely EEO complaint as to that appraisal. Because Plaintiff's EEO complaint was not filed until July of 1992, her allegations regarding her 1991 performance appraisal are untimely.[10] Defendants' Motion for Summary Judgment on Plaintiff's pre-1992 claims is SUSTAINED.

In summary, Defendants are entitled to summary judgment on each of Reynolds' claims against them. Their Motion for Summary Judgment on Reynolds' claims is SUSTAINED.

B. *McGinnis' Title VII Discrimination Claims*

In her Second Amended Complaint, McGinnis asserts that she has suffered race discrimination, as demonstrated by (1) being assigned low visibility projects, (2) being refused training necessary for career advancement, (3) being refused assignments to temporary duty (TDY's) necessary for career advancement, (4) being subject to discipline and criticism for acts for which similarly situated white employees were not disciplined, and (5) being rated below similarly situated white employees on their 1991 and 1992 appraisals. Her Complaints in the consolidated cases allege that she suffered retaliation after her reinstatement. In their Motion for Summary Judgment, Defendants' arguments do not track the allegations in the Complaints. Rather, they address Plaintiff's allegations, as clarified during her deposition, that they discriminated against her by (1) giving her an artificially low performance appraisal in 1992, (2) failing to promote her to a GS–346–12 position in January, 1993, (3) delaying her temporary promotion to a GS 346–12 position, (4) the negative comments of her supervisor, Colonel Moravek; and (5) giving her an artificially low performance appraisal in 1995. Addressing each allegation separately, Defendants argue that McGinnis cannot establish a *prima facie* case of dis-

9. Plaintiffs do not assert that any acts prior to July of 1992, other than the 1991 performance review, are properly before the Court, due to the "continuing violation" doctrine. Even if the Court were to consider Reynold's additional claims, to wit: the discipline for the alleged voucher fraud, the transfer to the Pacer Chariot program, and most of the refusals to allow her to receive training, all occurred prior to May, 1991, more than a year prior to the filing of an EEO charge. Thus, these allegations were not exhausted in a timely manner.

10. Even if the 1991 evaluation were timely as a continuing violation, Defendants would be entitled to summary judgment on this claim. As with the 1992 performance review, Plaintiff has provided no evidence that the 1991 review constituted an adverse employment action. She has not identified any adverse material change in her employment that has resulted from the review. Likewise, even if Reynolds' allegations of discrimination regarding being assigned to low visibility projects, being refused training, and being subject to discriminatory discipline had been exhausted, Defendants would be entitled to summary judgment on these claims. Plaintiff has asserted that these actions by Defendants led to her receiving lower performance reviews. Because Reynolds has not demonstrated that she was adversely impacted by the performance reviews, she has not demonstrated that the predicate acts (*i.e.*, Defendants' placement of her in the Pacer Chariot program, the denial of training and the discipline) constituted adverse employment actions.

crimination. Plaintiff responds that Defendants have "improperly attempt[ed] to separate out and minimize each individual job action at issue in this case." (Doc. # 107 at 13–14). She argues that the cumulative effect of the lack of training, the lack of assignment to high visibility programs and the artificially low appraisals has been to deny her promotions and career advancement (*id.* at 14). She states that it has also made her subject to reductions-in-force and emotional distress (*id.*).

1. *Pre-July, 1992 Allegations*

In her Complaints, McGinnis alleges that she was assigned to low visibility projects, was refused training necessary for promotion, was refused TDY's, and received an artificially low performance appraisal in 1991. As with Reynolds, Defendants assert that McGinnis' claims based on conduct which occurred prior to July of 1992 must be dismissed for failure to exhaust administrative remedies. McGinnis has responded, in a footnote, that her 1991 performance review was a continuing violation. She did not assert that any other pre-July of 1992 conduct was timely raised.

In her deposition, McGinnis concedes that she did not file an EEO complaint based on the 1991 appraisal and, rather, that she intended the 1991 appraisal to constitute background evidence regarding her timely discrimination claims. (McGinnis Depo. at 210–211).[11] Specifically, she testified:

A.... I didn't file on that one [the 1991 appraisal]. That was background. I didn't file on that one, I filed on the one George Kern signed. I didn't file on that one, that was just listed because that was background.

Q. That '91 appraisal is background?

A. Yes. The first appraisal I filed was the one where George Kern signed it, which would have been the Excellent.

Q. We'll move on to the '92 appraisal....

(*Id.*) In light of the foregoing testimony, the Court will not consider Plaintiffs' claims to the extent that they are based on incidents that took place prior to July of 1992, including her 1991 performance appraisal.[12] However, although those incidents will not be viewed as separate claims of discrimination, they may constitute relevant background evidence for her exhausted discrimination claims. *See Morgan,* 536 U.S. 101, 109–11, 122 S.Ct. 2061, 2070–71, 153 L.Ed.2d 106; *Boykin v. Michigan Dept. of Corrections,* 211 F.3d 1268, 2000 WL 491512,*3 (6th Cir.2000) ("we will still consider incidents which occurred outside of either of these statutes of limitations to the extent they are relevant to show that the conduct within the respective dates created a race based hostile work environment."); *United Air Lines, Inc. v. Evans,*

11. Plaintiff testified in her deposition that many of her other allegations were intended to be background information for her claims for relief. For instance, she testified that not being able to bring her child to work and being placed on low visibility projects were merely background evidence, and not actions for which she sought to hold the Air Force liable (McGinnis Depo. at 173–185). She further testified that any employment actions that occurred prior to 1991 was "out of time" and "[i]f you are out of time you can't file charges on it." (*Id.* at 184). Thus, Plaintiff did not consider any of the Air Force's actions that occurred prior to 1992 to be part of her Complaint. Accordingly, the Court will not consider any claims of discrimination which occurred prior to the limitations period, other than the 1991 performance appraisal.

12. As with Reynolds' claim, Plaintiff's claim regarding her 1991 performance appraisal concerns a discrete act of discrimination. Accordingly, even if Plaintiff had intended to state such a claim, it would be dismissed as untimely filed. *See Morgan, supra.*

431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (evidence of conduct that is time-barred "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue"); *Jackson v. Quanex Corp.*, 191 F.3d 647, 668 (6th Cir.1999) (same).

2. *1992 Performance Appraisal*

In her Second Amended Complaint, McGinnis asserts that Defendants discriminated against her on the basis of race when they evaluated her performance in 1992. The 1992 performance review rated McGinnis on nine categories, using a scale of 1 (the lowest) to 9 (the highest). Thus, the highest possible score for an employee was 81. McGinnis received a 9 score in four categories: Work Effort, Adaptability to Work, Problem Solving and Work Management. She received an 8 score in three categories (Work Productivity, Self-Sufficiency and Skill in Work), and a 7 score in the remaining two categories (Communication and Working Relationships). Thus, McGinnis' cumulative score was 74 out of a possible 81. In terms of overall performance, the evaluation form provided five possible ratings: Unacceptable (lowest), Minimally Acceptable, Fully Successful, Excellent and Superior (highest). Plaintiff was assessed as Excellent, which is defined as "Employee exceeds more than one-half of the critical elements and meets all other elements." Plaintiff's 1992 appraisal was signed by Mr. George Kern.

Defendants assert that McGinnis' 1992 performance evaluation is not actionable in two respects. *First,* they assert that it does not constitute an adverse employment. *Second,* they argue that Plaintiff cannot show that similarly situated non-minorities were treated differently. McGinnis contends that the evidence demonstrates that the 1992 appraisal was the product of discrimination, and that it constituted an adverse employment action, because it prevented her from being placed higher on the promotion eligibility list in 1993.

a. *Similarly Situated Employees*

Beginning with whether similarly situated non-minorities were treated differently, McGinnis asserts that she should be compared with Ms. Paula Lyons, the GS-346-12 Program Manager for the ACMI program. Plaintiff contends that she and Ms. Lyons were similarly situated in all relevant respects: they worked on the same program; they shared the same first-level supervisor, John Rodgers; they had the same second-level supervisor, Colonel Moravek; and they performed essentially the same duties. Although Ms. Lyons was a GS-346-12 Program Manager rather than a GS-346-11 employee, Plaintiff argues that these similarities render her a more appropriate employee for comparison than other GS-346-11 Case Managers. McGinnis states, in her affidavit (Doc. # 107, App.1), that Ms. Lyons, a Caucasian, was frequently drunk or absent from work without receiving any disciplinary action. Despite her absences and inability to work, she received a Superior rating, whereas Plaintiff, who allegedly did the majority of the work, received an Excellent rating. Thus, McGinnis contends that Ms. Lyons, a similarly situated employee, was treated better than she was.

Defendants contest McGinnis' assertion that Ms. Lyons is an appropriate employee for comparison. They argue that, as a GS-346-12 Program Manager, Ms. Lyons had different performance criteria on which she was judged, and that Plaintiff should be compared to other GS-346-11 employees. Turning to the evaluations for other GS-346-11 case managers, Defendants provide evidence that of the twelve employees who were rated by Mr. Kern (based on the recommendation of her prior

supervisor, Mr. Rodgers), nine employees received lower numerical scores, and received equal or lower narrative ratings, as indicated by the Table, below.

| *Name* | *Race* | *Total Numerical Score* | *Narrative Rating* |
|---|---|---|---|
| Ziolek | W | 75 | Superior |
| Fent | W | 75 | Superior |
| McGinnis | B | 74 | Excellent |
| Stroud | B | 72 | Excellent |
| Peters | B | 72 | Excellent |
| Bentley | W | 71 | Excellent |
| Gibson | W | 71 | Excellent |
| Liming | W | 70 | Excellent |
| Lintzenich | W | 70 | Fully Successful |
| Kravos | W | 68 | Fully Successful |
| Richardson | W | 60 | Fully Successful |
| Hufford | W | 40 | Fully Successful |

Seven of those co-workers were Caucasian. (A.R. at 488–511, 609).

Construing the evidence in the light most favorable to Plaintiff, the Court concludes Plaintiff can compare herself to Ms. Lyons for her *prima facie* case. Plaintiff has provided evidence that Ms. Lyons shared the same supervisors and worked on the same program. Although McGinnis held a permanent GS–346–11 Case Manager position while Ms. Lyons held a GS–346–12 Program Manager position, Plaintiff received a temporary detail to a GS–346–12 position from February, 1992, until July, 1992 (Doc. # 99, Ex. 2). Thus, McGinnis was performing the same duties for a portion of the evaluation period. Accordingly, Plaintiff has demonstrated that Ms. Lyons was a comparable employee for the July, 1992, performance appraisal.

Comparing McGinnis with Ms. Lyons, Plaintiff has presented evidence that she was treated differently. Plaintiff testified that she performed the bulk of the work on the program during that time period, and that she was a more than able employee. Despite her stellar job performance, she received an Excellent evaluation. In contrast, Plaintiff has presented evidence that Ms. Lyons was an alcoholic who was frequently drunk during work hours and was incapable of adequately fulfilling her job requirements. Despite these deficiencies, Ms. Lyons received the highest possible evaluation, a Superior rating. Construing this evidence in light most favorable to Plaintiff, McGinnis has raised a genuine issue of material fact as to whether similarly situated employees were treated differently.

b. *Adverse Employment Action*

In the present case, Plaintiff has asserted that the 1992 evaluation constitutes an adverse employment action, because it led to her being placed lower on the 1993 list of candidates for promotion than she would have been placed, absent discrimination. In other words, Plaintiff does not assert that the evaluation, by itself, constitutes an adverse employment action. Rather, she argues that it constituted an adverse employment action, because it formed the basis for the subsequent failure to be considered for promotion.

The Court disagrees. As discussed, *supra*, the Sixth Circuit has made clear that an unfavorable (or, in this case, not favorable enough) performance evaluation, standing alone, is not actionable, because it does not constitute an adverse employment action. *E.g., Dowell,* 221 F.3d 1334, 2000 WL 876767, *2 (6th Cir.2000); *Primes, supra.* Herein, McGinnis' performance evaluation did not, itself, result in a materially adverse change in the conditions of her employment. In other words, upon receipt of the 1992 performance evaluation,

she did not suffer a demotion, termination, or a loss in benefits due solely to that evaluation. The fact that the performance appraisal allegedly was used as a basis for a subsequent adverse employment action, *i.e.*, the denial of a promotion, does not render the performance appraisal actionable. Rather, the performance appraisal is merely evidence in support of that subsequent adverse employment action. *See Booker, supra.* Consequently, Plaintiff cannot maintain an action based on the 1992 performance appraisal. Defendants' Motion for Summary Judgment on this claim is SUSTAINED.

The Court notes, however, that although Plaintiff cannot maintain her claim based on the 1992 performance appraisal itself, that appraisal is relevant evidence as to whether the roster of employees who could be considered for promotion in January of 1993 was tainted with discrimination. Accordingly, the Court can, and will, consider McGinnis' argument that the artificially low performance appraisal resulted in her nonconsideration for promotion when addressing her failure to promote claim, to which it now turns.

3. *Failure to Promote*

In a failure to promote case, a plaintiff must show that (1) she is a member of a protected class; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) that she was considered for the position and, despite her qualifications, she was rejected for the job; and (4) that other employees of similar qualifications who were not members of the protected class were promoted at the time plaintiff's request for a promotion was denied. *Russell v. Drabik,* 24 Fed.Appx. 408, 412, 2001 WL 1556996, *3 (6th Cir.2001). In the present litigation, Defendants do not disagree that McGinnis was a member of a protected class or that she was qualified for a promotion to a permanent GS–346–12 position and had applied for such a position in 1993. In addition, it appears undisputed that no minorities were promoted at that time. Rather, Defendants assert that McGinnis was not "considered for" the GS–346–12 position, because she had been ranked 23rd on the list of eligible candidates, and only the top 20 candidates were considered.

Plaintiff responds that the reason she was not among the top 20 candidates is that the ranking was based on her 1991 and 1992 performance evaluations, which, although good, were artificially low. In other words, she asserts that the ranking of eligible candidates was tainted, because it was based on discriminatory performance evaluations and training opportunities. McGinnis asserts that, had she received the evaluations that she deserved, she would have ranked higher on the list, at the same level of two individuals who were promoted.

In support of their argument that McGinnis cannot set forth a failure to promote claim, Defendants provide the affidavit of AFSAC Staffing Specialist Charles J. Smith (Def.Ex.5), in which he describes the method used to select individuals for promotions. According to Mr. Smith's affidavit, in the later part of 1992, he received nine requests to fill GS–346–12 Logistic Management Specialist positions. Using a "promotion evaluation pattern," he created a candidate referral roster of persons eligible for promotion to one of the GS–346–12 positions. From this roster, he drafted a Merit Promotion Certificate and, due to the number of positions to be filled, a Supplemental Certificate. Each of the two certificates had ten names on it, for a total of twenty names. Selections for promotion were to be made from the Merit

Promotion Certificate and the Supplemental Certificate. (*Id.*)

Mr. Smith further indicates that Plaintiff was eligible for promotion. She ranked 23rd on the candidate referral roster. Because she was not among the top twenty candidates, she did not appear on the Merit Promotion Certificate or the Supplemental Certificate, and her name was not forwarded to the individuals responsible for selecting who would be promoted. Based on this evidence, Defendants assert McGinnis was not considered for promotion and, therefore, she cannot establish a *prima facie* case.

The Court agrees with Defendants that McGinnis has not presented evidence that she was considered for promotion by the promotion committee. Mr. Smith's uncontested evidence indicates that only twenty names were made available to the promotion committee, and that the committee was to select from these individuals. Plaintiff has repeatedly acknowledged that she was ranked 23rd, and that her name was not listed on the Merit Promotion Certificate or the Supplemental Certificate. Although McGinnis has asserted that Colonel Moravek chose not to consider the individuals who were ranked 21st through 30th on the eligibility list, in order to avoid considering Plaintiff, Mr. Smith has stated that the committee was to select only from the Merit Promotion Certificate or the Supplemental Certificate. There is no evidence that he had the authority to consider anyone other than those who were listed on those Certificates.

However, in creating the Merit Promotion Certificate and the Supplemental Certification, Mr. Smith applied the "promotion evaluation pattern" to McGinnis and she was given a rank among eligible candidates accordingly. Although McGinnis did not rank highly enough to be placed on the Merit Promotion Certificate or the Supplemental Certification, she was "considered" as part of the process of creating the lists. Accordingly, McGinnis has satisfied every element of her *prima facie* case of discrimination for her failure to promote claim.

In addition, although the uncontroverted evidence indicates that McGinnis was not considered by the promotion committee, the Court concludes that Plaintiff has presented evidence that she was discriminated against when the eligibility rankings were prepared, thus rendering her failure to be considered for promotion by that committee a product of discrimination. Construing Plaintiff's evidence in the light most favorable to her, it is evident that Plaintiff was a minority and was recognized as an eligible employee. McGinnis has provided evidence that the ranking for the Merit Promotion Certificate was based, in part, on her performance evaluations. Colonel Moravek chaired the promotion board, and was aware that Plaintiff was among the eligible employees. Plaintiff has stated that Colonel Moravek told her that he thought black employees were average compared to whites, and that he told Paula Lyons that McGinnis would never receive a permanent promotion to a GS–346–12 position. In addition, Colonel Moravek was McGinnis' second-level supervisor, who signed Plaintiff's evaluations. Furthermore, McGinnis has provided evidence that she was treated differently than a Caucasian co-worker, Ms. Lyons, with regard to her 1992 performance evaluation. In light of the foregoing, a reasonable jury could conclude that Plaintiff's performance evaluations were artificially low, in order to ensure that Plaintiff would not be ranked highly on an eligibility list and, therefore, would not receive a promotion. In other words, there is a genuine issue of material fact as to whether the ranking of employees from the list of eligible employ-

ees was tainted by discrimination, due to the use of discriminatory performance evaluations in the ranking process. *See Cross v. City of Ontario,* 97 F.3d 1458, 1996 WL 525378 (9th Cir.1996) ("Given the allegations that the staff evaluations were subjectively tainted with bias and racism, the allegations of racial slurs and jokes by staff evaluators, and the statistical evidence showing that blacks were under represented in the Department, there is a genuine issue of material fact as to defendants' motive in rejecting Cross for promotion."). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's failure to promote claim is OVERRULED.

4. *Delay in Temporary Promotion to GS–346–12*

Defendants seek summary judgment on Plaintiff's claim that she was discriminated against, on the basis of race, when her temporary promotion to a GS–346–12 position was delayed. They argue that Plaintiff ultimately received her temporary promotion, that it was made retroactive, and that she received all back-pay. Thus, Defendants argue, Plaintiff did not suffer an adverse employment action.

Courts which have addressed whether a delay in a promotion constitutes an adverse employment action have consistently held that it does not. For example, in *Pennington v. City of Huntsville, Ala.,* 93 F.Supp.2d 1201 (N.D.Ala.2000), the plaintiff, an African–American, asserted that he had suffered from discrimination when his promotion was delayed. The plaintiff had voiced his concerns about the delay, and his promotion went forward. The district court rejected the plaintiff's claim, reasoning that he ultimately received the promotion and he had suffered no real consequences from the initial contrary decision. *Id.* at 1220; *see also Benningfield v. City of Houston,* 157 F.3d 369 (5th Cir.1998); *Shabat v. Blue Cross Blue Shield of the Rochester Area,* 925 F.Supp. 977 (W.D.N.Y.1996) (delay in promotion did not constitute adverse employment action). The Sixth Circuit has likewise held that delays in granting promotions are not adverse employment actions. *Dobbs–Weinstein v. Vanderbilt Univ.,* 185 F.3d 542, 546 (6th Cir.1999) (delay in grant of tenure was not adverse employment action under Title VII when plaintiff ultimately received tenure), *cert. denied,* 529 U.S. 1019, 120 S.Ct. 1421, 146 L.Ed.2d 313 (2000).

Herein, McGinnis asserts that the delay did have adverse effects. *First,* she contends that there was a loss of pay, because she could have had the promotion earlier and for a longer period of time. *Second,* Plaintiff asserts that because the promotion was delayed, she lost the opportunity for a permanent GS–346–12 position. In her deposition, Plaintiff testified that she lost pay, because Mr. Rodgers did not put the temporary promotion package together properly, thus causing a delay. She states that the paperwork provided that she would receive a temporary promotion not to exceed 120 days, when Mr. Rodgers could have recommended a temporary promotion for a period up to one year. (McGinnis Depo. at 190–93). Although Plaintiff did not receive the longest possible temporary promotion, there is no evidence that the delay in processing the forms resulted in this alleged loss in pay. In addition, the undisputed evidence indicates that Plaintiff received retroactive pay once the promotion was processed. Accordingly, Plaintiff has not raised a genuine issue of material fact that she suffered a loss in pay due to the delay in processing her temporary promotion. Defendants are entitled to summary judgment on this claim.

Plaintiff further argues that the delay resulted in the loss of an opportunity for a

permanent GS–346–12 position. She testified that at the time that the temporary promotion should have occurred, there was a permanent GS–346–12 position on the ACMI Program that would have been available, and she would have been the only person within that directorate who was qualified for it. (McGinnis Depo. at 193). At the time that the temporary promotion went through, there was a list of "surplus" individuals, who received preferential treatment for available positions (*id.* at 193–202). Accepting Plaintiff's statements that the delay caused her to loss a promotional opportunity, such a loss may constitute an adverse employment action. *Gagnon v. Sprint Corp.,* 284 F.3d 839, 851 (8th Cir.2002) (written reminder resulted in the outright closing of job openings to him and the loss of opportunity to compete for any position, which, if true, might support a claim of retaliation); *de la Cruz v. New York City Human Res. Admin. Dep't of Social Serv.,* 82 F.3d 16, 21 (2d Cir.1996) (holding that transfer to a unit with less opportunity for advancement was sufficient to meet third prong of *McDonnell Douglas* test); *Tanay v. St. Barnabas Hosp.,* 2001 WL 262695, *6 (S.D.N.Y. Mar. 15, 2001) (loss of opportunity for advancement due to transfer sufficient to allege adverse employment action); *Kostenbader v. Kelly–Springfield Tire Corp.,* 2001 WL 910383 (N.D.Ill.2001)(loss of opportunity for promotion constitutes adverse employment action). Defendants' Motion for Summary Judgment on Plaintiff's claim, based on a delay in her temporary promotion, is OVERRULED, to the extent Plaintiff asserts that she lost opportunities for advancement as a result of the delay.

5. *Comments by Colonel Moravek*

Defendants assert that they are entitled to summary judgment on Plaintiff's claim that she suffered discrimination, on the basis of race, due to the comments of Colonel Moravek. Plaintiff has stated, in her affidavit, that in July of 1992, Colonel Moravek made racial remarks to her. He allegedly stated that "when he looks out on the floor, blacks are below average compared to whites," and that he would not let his son date an African–American. (McGinnis Aff. ¶ 3f). Defendants assert that these comments are insufficient to constitute an adverse employment action. The Court agrees.

As noted by Defendants, in *Allen v. Michigan Dept. of Corrections,* 165 F.3d 405 (6th Cir.1999), the Sixth Circuit addressed whether the plaintiff had presented a *prima facie* case of race discrimination, based on various racial comments by his supervisor. Therein, the plaintiff's supervisor had made the following comments to Allen: "I'm writing your black ass up," "Boy, I told you to get your black ass back into the block and finish your paper work," and "Allen you can't make sergeant because you won't play team ball." As a continuation of this incident, the supervisor told Allen that he was transferring him to an area in which he could be watched more closely because "[n]iggers can't be trusted." *Id.* at 408. Despite the racial hostility presented in these statements, the Sixth Circuit held that the plaintiff had not demonstrated a *prima facie* case of race discrimination, because the comments (along with receiving counseling memoranda and being monitored more closely than non-minority co-workers) did not result in a "materially adverse" change in Allen's employment status or in the terms and conditions of his employment.[13] *Id.* at 410. As with the comments in *Allen,* the statements by Colonel Moravek are insufficient

13. The Court notes that the Sixth Circuit held that Allen had set forth a hostile work environment claim against the Michigan Department of Corrections.

to constitute an adverse employment action. Defendants are entitled to summary judgment on McGinnis' claim based on these statements.

6. *1995 Performance Appraisal*

In Complaint C–3–96–383, Plaintiff alleges that her 1995 performance appraisal was based upon race discrimination. The individual charged with rating for the 1995 appraisal was Major John Leventis, and the reviewer was Mr. Ronald Venters. In her deposition, Plaintiff stated that she believed Mr. Venters and Colonel Breed, her third-level supervisor, discriminated against her. However, Plaintiff has not provided evidence that Colonel Breed was involved in her 1995 appraisal, or that Mr. Venters acted, in any way, with a discriminatory animus. Accordingly, Plaintiff has failed to present evidence that her 1995 appraisal was the result of racial discrimination. Defendants are entitled to summary judgment on this claim.

C. *McGinnis' Retaliation Claims*

In order to establish a *prima facie* case of retaliation, McGinnis must show that: 1) she engaged in protected activity; 2) her employer knew of the protected activity; 3) the employer took an "adverse employment action" against the plaintiff; and 4) a causal connection exists "between the protected activity and the adverse employment action." *Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999); *Dowell v. Rubin,* 234 F.3d 1268, 2000 WL 1679440 (6th Cir.2000).

1. *Termination for Misuse of Credit Cards*

Plaintiff asserts that Defendants retaliated against her due to her EEO activity by terminating her employment for misuse of credit cards. In her deposition, Plaintiff clarified her claim, indicating that she believed that the retaliation was performed by General Habedank, who was the commander of the IOC, AFSAC, and who made the ultimate decisions in AFSAC. (McGinnis Depo. at 52). According to Plaintiff, General Habedank directed Colonel Hardin to sign the letter, discharging her.[14] Defendants contend that the Plaintiff's claim must fail, because she cannot demonstrate that General Habedank is responsible for her termination.

It is undisputed that Plaintiff can establish three elements of her *prima facie* case. She filed numerous complaints with the EEO Office, as well as this lawsuit, prior to her termination in 1994. Plaintiff has testified that General Habedank was aware of her EEO activity (McGinnis Depo. at 52–53, 287–88). Specifically, McGinnis testified that "[h]e was very upset of the fact that I had filed prior EEO cases. And he had said so to various [managers] and NAAC people and various personnel, and in open meetings he would say that he was upset about the files [charges] that were charged [filed] against his organization, his center." (McGinnis Depo. at 52–53). In addition, by virtue of being terminated from her position, Plaintiff clearly has suffered an adverse employment action.

The parties dispute, however, whether Plaintiff can demonstrate a causal connection between her termination and her EEO activity. "In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen v. Michigan Dept. of Corrections,* 165

14. McGinnis indicated in her deposition that she did not believe that Colonel Hardin had discriminated against her. (McGinnis Depo. at 50).

F.3d 405, 413 (6th Cir.1999); *see EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997) (citations omitted).

Plaintiff presents three bases to support her assertion that a causal connection exists between her protected activity and her removal. *First,* she asserts that the timing of the adverse employment action supports an inference of retaliation. "Temporal proximity, when coupled with other facts, may be sufficient in certain cases to establish the causal-connection prong in a Title VII case." *Mulhall v. Ashcroft,* 287 F.3d 543, 551 (6th Cir.2002), citing *Nguyen v. City of Cleveland,* 229 F.3d 559, 567 (6th Cir.2000) (noting that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support" the inference of a causal connection but that temporal proximity, without more, was insufficient in the case before the court). Indeed, McGinnis filed suit in this Court in January of 1994, four months prior to her removal.

*Second,* McGinnis asserts that she was treated similarly to Plaintiff Reynolds, who also filed EEO complaints and was fired for misuse of her government credit card. *Third,* McGinnis argues that she, as well as Reynolds, were treated differently from other individuals who misused their credit cards but were not terminated for that conduct. McGinnis notes that she and Reynolds were the only individuals who were ultimately terminated due to their misuse of their Diner's Cards, and that they both submitted numerous EEO complaints about their treatment by their supervisors. Turning to other individuals who had made personal use of their Diner's Card, McGinnis indicates that Ted Wendelin, a co-worker who also had Colonel Loewenhagen as his second-level supervisor, received only a seven-day suspension for his unauthorized use of his credit card. McGinnis also notes that two other individuals within the AFSAC units under General Habedank's command (Frank Ambrose and Margaret Debow) received Notice of Proposed Removal letters. However, both recommendations were reduced to 30 day suspensions. The second-level supervisor for Mr. Ambrose and Ms. Debow was Colonel Moravek.

In order for Plaintiff to establish that a causal connection exists between her EEO activity and her termination, she must demonstrate that the individual who allegedly retaliated against her was responsible for the decision to terminate her or had significant input in that decision. *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 185 (6th Cir.1992) ("The supervising employee need not have ultimate authority to hire or fire to qualify as an employer [under Title VII], so long as he or she has significant input into such personnel decisions."), quoting *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989), *modified on other grounds,* 900 F.2d 27 (4th Cir.1990) (en banc). In her deposition, Plaintiff states that, although Colonel Hardin issued the Notice of Removal, General Habedank made the decision to fire her (McGinnis Depo. at 53–54).[15]

15. In responding to Defendants' Motion, Plaintiff seems to have adopted a second position, in the alternative, that Colonel Hardin did, in fact, make the decision to terminate her employment, and that he relied upon false, discriminatory information from her prior first-level supervisor, John Rodgers. In her argument that Defendants' reason for her removal was pretextual, McGinnis argues that Colonel Hardin had no basis in fact to conclude that she had engaged in prior credit card abuse and that she had shown no remorse. These arguments are irrelevant, in light of the fact that Plaintiff states in her deposition that she did not believe that Colonel Hardin had discriminated or retaliated against her. McGinnis cannot create a genuine issue of material fact by contradicting her

When asked how she knew that the decision was made by General Habedank, McGinnis responded:

> A. Because he is the one that told me I was fired, not Colonel Harding [sic]. When I spoke to Colonel Harding [sic], he didn't know what the decision was. When I spoke to General Habedank, he said, you are fired.

(*Id.* at 54). When asked the temporal relationship between these discussions, Plaintiff indicated that she talked to Colonel Hardin first and then General Habedank, and that these conversations took place "[w]ithin the same week. It may have even been the same day." (McGinnis Depo. at 54).

Although Plaintiff has provided evidence that General Habedank was aware of the decision to terminate her employment, she has not provided any evidence that General Habedank participated in that decision. Moreover, Colonel Hardin testified in his deposition that he alone made the decision to remove McGinnis:

> Q. Was this your decision to remove Ms. McGinnis?
>
> A. Yes, it was.
>
> Q. Did anyone recommend it to you?
>
> A. No one recommended it. Unfortunately, I didn't even talk with anyone after I got the—after I got Ms. McGinnis' reply and her representative, I didn't even discuss it with anyone. I studiously avoided even being with anyone who I thought might even ask me what am I doing.
>
> Q. Just for the record, Colonel, that is your decision to remove Ms. McGinnis [referring to Exhibit 6]?
>
> A. Yes, it is.

(Hardin Depo. at 152). He specifically testified that he did not have any discussion with General Habedank about his decision to remove Ms. McGinnis, either before or after her removal.[16] (Hardin Depo. at 158). Rather, Colonel Hardin indicated that his decision was based on his review of McGinnis' response to Mr. Williams' Notice of Proposed Removal; her memorandum to Mr. Williams regarding the January 24, 1994, counseling session (*id.* at 123); and the Douglas factors (*id.* at 125–28). Colonel Loewenhagen likewise testified that he had recommended termination to Colonel Hardin, but that Colonel Hardin imposed the final punishments (*id.* at 119–121). He testified that it was up to Colonel Hardin "to review the facts and he spent a great deal of time doing it in determining whether or not I—you know, my recommendation would be honored." Colonel Loewenhagen continued: "I can

prior deposition testimony with an affidavit, and she certainly cannot do so with unsupported statements in her Opposition Memorandum. *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir.1997) ("[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony.").

In addition, Plaintiff has asserted that there was discrimination the chain of command and, thus, the fact that the ultimate decision-maker had no animus is irrelevant. She contends that the basis for Colonel Hardin's belief that Plaintiff had engaged in prior credit card abuse came from John Rodgers, who had discriminatory animus towards her. While Plaintiff is correct that a decision to terminate can be retaliatory when the decision-maker relies upon information from an individual with discriminatory animus, there is no suggestion that General Habedank, the individual who Plaintiff has testified made the decision to terminate, relied upon information to that effect.

**16.** Although Colonel Hardin was informed that Mr. Williams would be recommending termination, he did not have any discussions with Mr. Williams about what punishment Mr. Williams intended to propose (Hardin Depo. at 96).

tell you that his decision was also based on a great deal of time spent with the civilian personnel officers, and their recommendation at the time was the same thing, removal for cause." (*Id.* at 119). In summary, there is no evidence, other than Plaintiff's speculation, that the decision to terminate her employment was made by anyone other than Colonel Hardin. Although other individuals in the chain of command made recommendations to Colonel Hardin, the uncontroverted evidence indicates that he performed an independent review of McGinnis' situation and reached his own conclusion. Because Plaintiff has not provided evidence that General Habedank made the decision to terminate Plaintiff's employment with the USAF or had significant input into that decision, she has not established that a causal connection exists between the decision to terminate her employment with the USAF and her prior EEO activity.[17] Accordingly, Plaintiff has not created a genuine issue of material fact that General Habedank retaliated against her, due to her prior EEO activity, when he allegedly terminated her employment. Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim, based on her discharge, is SUSTAINED.

2. *1994 Performance Appraisal*

Plaintiff asserts that Defendants retaliated against her subsequent to her reinstatement by providing her with a performance appraisal in 1994 that rated her as Fully Successful rather than Excellent. Defendants note that, as a result of mediation, Plaintiff's appraisal was upgraded to Excellent. In addition, the parties have agreed that this performance appraisal is no longer an issue in this case (McGinnis Depo. at 241). Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claim, based on the 1994 performance appraisal.

3. *Assignment of Lower-Graded Work*

In her Amended Complaint, McGinnis asserts that management retaliated against her for her prior EEO activities by providing her lower-graded work assignments and a greatly decreased workload. In their Motion, Defendants argue that they are entitled to summary judgment on this claim on two grounds. *First,* they assert that McGinnis cannot establish that the retaliator knew of her prior EEO activity. *Second,* they contend that the assignment of lower-graded work did not constitute an adverse employment action.

Beginning with Defendants' first argument, the government contends that Plaintiff cannot establish a *prima facie* case of retaliation, because she cannot identify the individuals who retaliated against her and, thus, she cannot demonstrate that they knew of her prior EEO activity. In her deposition, Plaintiff acknowledged that she was uncertain who was responsible for her assignments. However, she identifies the individuals within management who discussed her placement and assignments upon her return. She testified:

Q: * * * My first question is, who was responsible for assigning you this lower graded work? In looking at your response to Dependants' first set of interrogatories at number 7, you state that Lieutenant Colonel D.J. Collins informed you of the assignment, but you do not know who was the ultimate decision-maker.

17. Because Plaintiff has not provided evidence that General Habedank made the decision to terminate her employment, the fact that other individuals under his command may have been treated differently is irrelevant to the Court's analysis.

A: Right.

Q: So you don't know who was giving you this lower graded work?

A: No. Because what happened was, before we came back, they had a meeting, the management officials did, discussed that we were coming back and where they were going to put us, and at the time they said they didn't have any work for us and anywhere for us to return, and they were going to try to fit us in, and Colonel Moravek said he would take Reynolds. And I was kind of out there. They put me in the ENE directorate with Venters, and Venters had to find somewhere to put me and put me with Collins. Collins told me he didn't have any work for me to do, so basically he went to upper management, and they said just give her something until whatever happens. I don't know if they didn't expect me to stay around or what. They did try to work out something for me to go to Area B, but being 11 and the jobs in Area B being a 12, there was no way to do a swap.

* * * * * *

Q: So then I am just trying to figure out who gave you the—

A: Ultimate decision-maker—

Q: —lower graded work?

A: I am saying somewhere that they had a meeting, upper management, being Venters and Breed and Collins, and decided what it was we will do with her for right now, being, Colonel Breed being the ultimate decision-maker over EC at that time.

(McGinnis Depo. at 242–44). Although Plaintiff cannot name which individual within management was the ultimate decision-maker regarding her assignments, she has identified Venters, Breed, and Collins as the individuals who met to discuss that issue. Plaintiff has further testified that each of these individuals was aware of her prior EEO activity. (*Id.* at 260)(Collins was aware of EEO activity); (*Id.* at 266)(Venters was aware of prior EEO activity); (*Id.* at 265–269)(Breed). Accordingly, even though Plaintiff cannot indicate which of the three individuals ultimately decided to give her lower grade work assignment, she can establish that each of the individuals involved knew of her protected activity. Defendants are not entitled to summary judgment on the basis that Plaintiff cannot not establish that the alleged retaliator was aware of her EEO activity.

Defendants also contend that the lower-graded work assignments did not constitute an adverse employment action. They argue that Plaintiff performed supply work as part of her logistical management duties, and that she did not receive any change in pay or benefits due to the assignments.

"Significantly diminished material responsibilities" may constitute an adverse employment action. *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir.1999). McGinnis has provided evidence that when she was reinstated after her suspension, she was assigned to two cases, the S cases and the G cases. She indicated that the S cases were closed, and therefore she had no work to perform on them. As for the other cases, she was limited to supply work only (McGinnis Depo. at 247). Although Plaintiff acknowledges that the logistics management specialist position includes supply work, she testified during her deposition that "[i]t includes but is not 100 percent supply work. There is a small, small amount of supply work." (*Id.* at 246). Plaintiff further testified that she

"constantly asked for work to do which would be in line with a G–346–11, and they would always say, we do not have any work for you." (*Id.* at 255). Consequently, McGinnis passed the time "[s]itting at [her] desk waiting for work or running around trying to find work ..." (*Id.* at 256). Construing the evidence in the light most favorable to McGinnis, she has established that she was assigned little work upon her return and only lower-graded supply work. Accordingly, she has demonstrated that a genuine issue of material fact exists as to whether she was given substantially diminished job responsibilities upon her return. In other words, there is genuine issue of material fact as to whether Plaintiff suffered an adverse employment action. Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim, based on reduced job responsibilities, is OVERRULED.[18]

4. *Supervisor's Comments*

In her response to Defendant Widnall's Interrogatories, Plaintiff indicated that Lieutenant Colonel Collins made comments in retaliation for her prior EEO activity. She indicates that he stated: "How do I appraise you when you're going to all those meetings (EEO, lawyer, etc.)?" Defendants assert that this statement does not constitute an adverse employment action. The Court agrees. Although Plaintiff states that she believes that she received a lower performance appraisal in September of 1995, she has provided no evidence that she suffered a material change in the terms and conditions of her employment due to this isolated statement. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim, based on Lieutenant Colonel Collins' remark, is SUSTAINED.

5. *1995 Performance Appraisal*

Plaintiff asserts that she received a lower annual appraisal in 1995 in retaliation for her prior EEO activity. In the numerical categories, McGinnis received a score of 8 in six categories (Adaptability to Work, Problem Solving, Communication, Work Productivity, Self–Sufficiency and Skill in Work), and a score of 7 in three categories (Work Effort, Working Relationships and Work Management), for a total numerical score of 69. She received a narrative rating of Fully Successful. The performance appraisal, dated July 17, 1995, was signed by John Leventis, her first-level supervisor, and by Ronald Venters, her second-level supervisor (McGinnis Depo., Ex. 13).

In her EEO Complaint (McGinnis Depo. Ex. 25), McGinnis asserts that she was discriminated against by Mr. Ronald Venters, and Colonel John A. Breed. Plaintiff claims that she received a "Fully Successful" evaluation when she was supposed to receive, pursuant to the labor contract, her "rating of record," *i.e.*, the last rating that she had received, which was Excellent (McGinnis Depo. at 270). In her deposition, she states that Mr. Venters told Mr. Leventis what rating to give, as Mr. Leventis had only recently become McGinnis' supervisor.

Defendants assert that they are entitled to summary judgment on Plaintiff's claim, contending that Plaintiff has not established that there is a causal connection between her prior EEO activity and the alleged retaliatory conduct by Mr. Venters and Colonel Breed. In addition, Defen-

18. Defendants have not presented a legitimate, nondiscriminatory reason for the alleged assignment of lower-graded work, nor have they argued that McGinnis cannot demonstrate that any proffered reason is pretextual. Accordingly, the Court need not address these issues.

dants assert that the appraisal did not constitute an adverse employment action. Plaintiff has responded that Collier and Breed were aware of Plaintiff's situation, and that the violation of a policy (presumably the labor contract) is sufficient to raise an inference of retaliation.

Although McGinnis asserts that Colonel Breed retaliated against her, she has provided no evidence that he was involved with her 1995 evaluation. Plaintiff has failed to establish a *prima facie* case, with respect to Colonel Breed, because she has failed to demonstrate a causal connection between her EEO activity and any conduct on his part regarding that performance appraisal.

With respect to Mr. Venters, Plaintiff has also failed to demonstrate a causal connection between her protected activity and her appraisal. Other than her belief that Major Leventis was instructed by Mr. Venters to rate her as Fully Successful, Plaintiff has provided no evidence to raise an inference of a retaliatory motive by Mr. Venters. Moreover, Major Leventis has indicated that he based his evaluation on the limited opportunity that he had to supervisor her, and that he offered McGinnis an opportunity to discuss his rating, an opportunity of which she did not avail herself. Although Plaintiff has argued that she was supposed to receive her "rating of record" when she went to work for the union, she has failed to substantiate that assertion. Plaintiff has not provided the Court with the labor contract, and she has provided no evidence that her "Excellent" rating from 1994 thus constitutes her rating of record. The Court, therefore, concludes that Plaintiff has failed to raise a genuine issue of material fact that a causal connection exists between her 1995 narrative rating and her prior EEO activity.

D. *Plaintiffs' Privacy Act Claims and Constitutional Right to Privacy Claims*

Plaintiffs have set forth claims for violation of the Privacy Act and their Constitutional right to privacy, asserting that Defendants wrongfully disclosed information about their EEO complaints. With regard to the Privacy Act claims, Plaintiffs have indicated that they are no longer pursuing same, due to the fact that emotional damages are not compensable. The Court agrees that Sixth Circuit precedent indicates that a plaintiff must demonstrate out-of-pocket losses, not emotional distress, to recover under the Privacy Act. *Hudson v. Reno,* 130 F.3d 1193, 1207 n. 11 (6th Cir.1997), citing, *inter alia, DiMura v. FBI,* 823 F.Supp. 45, 48 (D.Mass.1993) (dismissing wrongful disclosure claim, pursuant to Rule 12(b)(6), because the plaintiff alleged only emotional damages); *see also Meldrum v. United States Postal Service,* 230 F.3d 1358, 2000 WL 1477495 (6th Cir.2000)(plaintiff who alleged that he suffered stress, anxiety, and depression due to the improper maintenance and the improper disclosure of a file "failed to establish that he suffered any adverse effects for which he can recover under the Act."). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Privacy Act claims is SUSTAINED.

Defendants have sought summary judgment on Plaintiffs' claims that Defendants have violated their Constitutional right to privacy. They argue that the alleged disclosure of Plaintiffs' EEO activity is not a violation of fundamental rights and does not implicate the "concept of ordered liberty."

In the Sixth Circuit, a constitutional right to nondisclosure of certain types of private information exists, but not all disclosures of private information will trigger constitutional protection. *J.P. v. DeSanti,*

653 F.2d 1080, 1090 (6th Cir.1981). Unlike many of the federal courts of appeals, the Sixth Circuit has construed this informational right to privacy narrowly, holding that it is triggered "only when the interest at stake relates to 'those personal rights' that can be deemed 'fundamental' or 'implicit' in the concept of ordered liberty." *Bloch v. Ribar,* 156 F.3d 673, 684 (6th Cir.1998) (quoting *DeSanti,* 653 F.2d at 1090); *Overstreet v. Lexington-Fayette Urban County Govt.,* 305 F.3d 566, 574 (6th Cir.2002) ("This Court has been loath to view either *Whalen* or *Nixon* as having created a constitutional privacy right that protects against the disclosure of personal information."). Thus, the court of appeals has set forth a two-step process for addressing informational right to privacy claims: (1) the interest at stake must be either a fundamental right or one implicit in the concept of ordered liberty; and (2) the government's interest in disseminating the information must be balanced against the individual's interest in keeping the information. *Id.* The Sixth Circuit has analyzed the first step strictly, stating that a constitutional right exists only where constitutionally recognized liberty interests or bodily integrity are implicated. *See Kallstrom v. City of Columbus,* 136 F.3d 1055 (6th Cir.1998) (release of undercover police officers' personnel files to members of violent gang they had infiltrated and were testifying against violated officers' privacy interest in bodily integrity and their personal security). It has noted that the Supreme Court has found that "fundamental" interests include the privacy interest one has in matters relating to marriage, procreation, contraception, family relationships, child rearing, and education. *Overstreet,* 305 F.3d at 575.

Although Plaintiffs have asserted that their confidentiality was breached, in that their EEO complaint was shown to managers and the contents were disclosed to their co-workers, Plaintiffs have not contested Defendants' arguments. They have not asserted, nor have they provided evidence, that any fundamental interest has been invaded. In addition, Plaintiffs have neither argued nor provided evidence that the disclosure has threatened or is likely to threaten their personal security. Accordingly, in light of the Sixth Circuit's strict view of this claim, Defendants' unopposed Motion for Summary Judgment on Plaintiffs' claims of violation of their informational right of privacy is SUSTAINED.

In summary, Defendants' Motion for Summary Judgment is SUSTAINED in PART and OVERRULED in PART. Defendants are entitled to summary judgment on each of Plaintiff Reynolds' claims, and they are dismissed in their entirety. With regard to Plaintiff McGinnis' claims of race discrimination, Defendants are entitled to summary judgment on Plaintiff's pre 1992 claims, her claim based on the 1992 performance appraisal, her claim that she lost pay due to the temporary delay in her promotion, the comments by Colonel Moravek, and her 1995 performance appraisal. Defendants are likewise entitled to summary judgment on her retaliation claims, in violation of Title VII, based on her termination, her 1994 performance appraisal, her supervisor's comments, and her 1995 performance appraisal. In addition, Defendants are entitled to summary judgment on McGinnis' claims for violation of the Privacy Act and of her Constitutional right to privacy.

The following Title VII claims by McGinnis REMAIN: (a) her failure to promote claim, due to the tainted eligibility list, (b) her discrimination claim based on the delay in her temporary promotion, to the extent that it caused her to lose opportunities for a subsequent promotion, and (c) her retaliation claim, based on being assigned lower-graded work.

Counsel listed below will take note that a telephone conference call will be had, beginning at 8:40 a.m., on Tuesday, February 4, 2003, for the purpose of resetting the trial date and other dates leading to the resolution of this litigation.